THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* DONALD L. SHARKEY, Respondent-Appellant.

Second District   No. 77-402

Opinion filed May 26, 1978.—Rehearing denied June 9, 1978.

258

Mary Robinson and Mark Heyrman, both of State Appellate Defender's Office, of Elgin, for appellant.

Dennis Ryan, State's Attorney, of Waukegan (Phyllis J. Perko and Barbara A. Preiner, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE. GUILD delivered the opinion of the court:

At a hearing before the circuit court of Lake County on May 23, 1977, the respondent was found to be a "person in need of mental treatment" under the provisions of the Mental Health Code of 1967 (Ill. Rev. Stat. 1975, ch. 91½, par. 1—1 et seq.). He was ordered hospitalized at the Downey Veteran's Administration hospital. The cause was also continued to June 20, 1977, at which time further testimony was taken. The respondent was found to be in need of further treatment and he was returned to Downey. The respondent appeals from these orders and has raised three issues for review: (1) whether he was found to be in need of mental treatment by clear and convincing evidence; (2) whether the trial court's order hospitalizing the respondent violated the provisions of the Mental Health Code as well as due process of law where the court failed to require the State to show that all reasonably available, less restrictive alternatives had been exhausted; and (3) whether the respondent was denied the effective assistance of counsel, in violation of the Mental Health Code and the United States Constitution.

The record before us reveals the following pertinent facts. At the hearing on May 23, 1977, both Donald F. Sharkey, the father of the respondent, and Dr. W. John Kenfield, the assistant chief of psychiatry at Downey, testified.

The father, who originated this action, related that on May 10, 1977, the respondent appeared to be in a highly nervous condition and agreed to go to the hospital. The father related that when they arrived at Little Company of Mary hospital the respondent leaped from the car while it was still moving and entered the hospital, but he did not remain therein. The respondent was left at the hospital by his parents who hoped he would admit himself.

On the evening of May 11 the father was notified by the Racine, Wisconsin, authorities that the respondent had been arrested there for disorderly conduct but that he would be released into the father's custody and the charge dropped if he were taken to Downey. The father drove to Racine with the respondent's brother and sister to pick him up. On the return trip the respondent grabbed the steering wheel several times while the car was moving and also stepped on the accelerator at least six or eight times while the father was driving. The father testified that his son was

residing at home and was receiving social security disability benefits. He also related that in 1972 the respondent threatened to shoot an alderman in a tavern and when he was arrested he was found to have a stolen gun in his briefcase. The respondent was then found not competent to stand trial and he was committed by court order to the mental health facility at Tinley Park. The respondent subsequently was admitted to Downey on his own request and was eventually released. Except for the arrest in Racine no other incidents had occurred since 1972.

The second witness, Dr. Kenfield, testified that he saw respondent on May 12, 1977, relative to making arrangements for his care. He found the respondent in restraint and uncommunicative. Another staff psychiatrist reported to Dr. Kenfield at that time that the respondent had become physically aggressive and assaultive towards other patients and that it was necessary to physically restrain him. The doctor concluded at that time, after further observation, that the respondent was acutely psychotic but that he did not know if the psychosis were drug induced or an excitement type of catonia schizophrenia. Subsequent tests showed a substantial increase in blood urea nitrogen. That, together with other data, was compatible with a refusal to take food. It was then necessary to infuse fluids intravenously and to feed the respondent by a tube into his stomach. On May 23, the morning of the hearing, the respondent stated that he would take fluids and eat. The tubes were then removed. Dr. Kenfield also testified that the respondent was in need of mental treatment and that special kinds of treatment would be considered. He stated that the treatment could not be handled on an out-patient basis and that the treatment could be performed within 30 days. Therefore he requested an extension of the hearing until that time. Dr. Kenfield further testified that the patient was disoriented and confused and, while the refusal of the respondent to eat caused certain physical problems which were treated, there remained the underlying and still existing question of what caused the respondent to cease his proper intake of food.

On the basis of this testimony the court found that respondent presented a danger to himself and ordered his further hospitalization. The court also set a hearing on June 20, 1977, to review the matter.

At the review hearing on June 20, 1977, Dr. Nedella Krishana, a psychiatrist at Downey, testified that the respondent had been under his care for a month. He stated that initially the respondent was dehydrated, disoriented, confused, uncooperative, did not wish to speak, and was unable to understand that he was mentally and physically ill, even though he was quite sick at the time. Dr. Krishana was of the opinion that the respondent was suffering from an unknown physical condition which was affecting the central nervous system, thus manifesting disorientation, urine incontinence and abnormal bowel movements. E.E.G. tests showed

cerebral atrophy. Dr. Krishana testified that the respondent should receive a sophisticated brain scan test and, depending upon the result of that test, specific treatment could be initiated. The doctor could not be specific as to the expected duration of treatment.

The court then inquired whether the respondent had anything to say. The record reflects that respondent then rambled incoherently, as the following colloquy reflects:

"MR. SHARKEY: I don't want to discourage anybody, because I know everyone here perhaps had, some here have my interests at heart, I hope.

THE COURT: You can be sure of that.

MR. SHARKEY: What I mean is, I would like to have—

THE COURT: Let the record reflect that several minutes have passed, and at this time we feel we must proceed."

The court then found the respondent was unable to take care of himself without running the danger of being harmed, and ordered that treatment continue at Downey.

On December 16, 1977, respondent filed a petition for discharge and an independent psychiatrist, Dr. Leo M. Goldman, was appointed to examine him. Dr. Goldman filed his report on December 27, 1977. That report recited that the respondent had been admitted to Downey with dehydration and a 60-pound weight loss, due to his refusal to eat or drink, but that the respondent did not then recognize the seriousness of his own malnourished state. The report recommended release at this time. On January 9, 1978, the respondent was discharged, the court finding that the respondent was not then in need of mental treatment. As the result of this finding the State has filed a motion to dismiss this appeal as moot, which we have ordered taken with the case. Respondent objects to the motion to dismiss and contends that the collateral circumstances from a dismissal of this appeal require our consideration of this issue.

With regard to collateral legal consequence, there seems to be a divergence of opinion in the appellate courts. In *People ex rel. Craine v. Boyd* (5th Dist. 1976), 41 Ill. App. 3d 538, 353 N.E.2d 696, the State argued that the case should be dismissed as moot, the respondent having been given an absolute discharge. The court there recognized that the application of the collateral circumstance exception to the mootness rule should be considered on a case to case basis. The majority of the court reasoned that respondent's absolute discharge indicated a complete recovery and that he could then take his place in society with no adverse collateral consequences. The court did not mention, and apparently did not consider, possible future proceedings against respondent. The First District faced this issue in *In re Sciara* (1974), 21 Ill. App. 3d 889, 316 N.E.2d 153, and also held that the question of whether there are collateral

legal consequences must be decided on a case to case basis. *Sciara* involved prior commitments, and at least one attempt to commit the respondent subsequent to the one before the court. The court, after quoting from *In re Ballay* (D.C. Cir. 1973), 482 F.2d 648, concluded that, considering the totality of the circumstances presented, the adjudication therein might continue to plague the respondent in some future proceeding and could adversely affect her in other respects, such as employment and child custody proceedings. After considering the merits of the appeal, the court held that the proof presented was insufficient to establish that the respondent was a person in need of mental treatment and reversed. In *In re Graham* (1976), 40 Ill. App. 3d 452, 352 N.E.2d 387, the First District considered a case involving three prior hospitalizations and concluded that the adjudication in question might present problems in future proceedings and affect respondent's efforts to obtain employment. After considering the merits of the appeal, the court upheld the trial court's determination that the respondent was a person in need of mental treatment.

■■ We believe that the case before us is more nearly akin to *Sciara* and *Graham* than to *Boyd*. Specifically, we note that the report of Dr. Goldman, the psychiatrist who examined the respondent shortly before his release, states in part:

> "* * * because of the lack of an observing ego it is probable that there will be future psychotic episodes requiring hospitalization and at that time he will not recognize any symptoms as an illness, and commitment proceedings will again be necessary. Nevertheless, he is presently in sufficient command of his mental faculties to be released to the community."

It is therefore apparent that this respondent may very likely be subject to future proceedings and that his past commitments, including this one, could adversely affect him at that time. For that reason it is unnecessary for us to take any position on whether or not the abstract possibility of future proceedings against a respondent would in all cases be a sufficient collateral consequence to entitle the respondent to review of a commitment after release. In this case it is a probability, according to the psychiatrist, and we hold that to be a sufficient collateral consequence to invoke the exception to the mootness doctrine. We therefore pass to the merits of this case.

At the outset we should observe that a mental commitment proceeding of this nature is for the benefit of both the public and the patient. In this connection the appellate court, in *People v. Sansone* (1974), 18 Ill. App. 3d 315, 322, 309 N.E.2d 733, 738, made the following pertinent and cogent comment:

> "Inherent in civil commitment proceedings is the promise of the

State, under a *parens patriae* theory, that the person who is being deprived of his liberty will receive treatment. * * * The procedures set forth in the Illinois Mental Health Code are a legislative recognition that civil commitment is a deprivation of personal liberty, and their purpose is to provide adequate safeguards against unreasonable detention and commitment."

Likewise, the Supreme Court in its recent opinion in *In re Stephenson* (1977), 67 Ill. 2d 544, 554, 367 N.E.2d 1273, 1276-77, stated that the current Mental Health Code,

"* * * represents a serious attempt to provide beneficial treatment and care for the mentally ill with the minimum ostracism and confinement consistent with protection of the public. * * * Moreover, the individual involved, as well as society, has a strong interest in getting needed care or treatment which will enable him to function normally, * * *."

The briefs of the respondent disregard these admonitions and ignore the benefit which the respondent gained by his hospitalization.

The first issue raised by the respondent is whether he was proved to be in need of mental treatment by clear and convincing evidence. Upon this issue, respondent argues: (1) that the State failed to prove a mental disorder because the testimony of Dr. Kenfield, who testified at the May 23 hearing, was confusing, contradictory and based on hearsay; (2) that it was violative of respondent's fifth amendment right to silence to base the diagnosis partly upon his refusal to communicate; (3) the State failed to prove that respondent was dangerous to himself or others, or unable to care for himself; and (4) that the State failed to prove the required causal connection between respondent's mental disorder and his dangerousness or inability to care for himself.

■■ We have examined the testimony of Dr. Kenfield and do not find it confusing or contradictory. The doctor clearly testified that respondent was acutely psychotic, although the exact cause of that condition was not known at that time, and an exact course of treatment was likewise not determined. The testimony also recited some of respondent's symptoms. In addition, respondent's father testified to his past problems, and the incident which led to the commitment in question. We find there was clear and convincing evidence that respondent was suffering from a mental disorder as well as physical problems.

■■■ Respondent also objects that Dr. Kenfield's diagnosis was based, in part, upon hearsay. Specifically he objects to Dr. Kenfield's testimony concerning that the other staff psychiatrist said about the respondent's aggressive physical activity towards others and that respondent's mother had told the doctor that respondent was not eating. In *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171, the supreme court of this State

overruled an earlier decision and specifically held that expert medical opinion as to a person's sanity, based in part upon medical or psychological records which were compiled by others and which were not admitted into evidence, was admissible. The supreme court noted that these reports were the type customarily utilized by the medical profession and that this assures a high degree of reliability in such reports. The supreme court, in reaching this decision, quoted from Rule 703 of the Federal Rules of Evidence (28 U.S.C.A. Rule 703), and, in addition, quoted from the advisory committee note to that rule as reasons supporting its conclusion. This same rule has previously been applied to expert medical testimony at commitment proceedings. (*People v. Espinoza* (1977), 54 Ill. App. 3d 36, 369 N.E.2d 325.) In that particular case the testifying doctor had relied upon a written medical record as part of the basis for his diagnosis. We can conceive of no particular reason to distinguish between written records and oral reports, at least under the circumstances presented herein. It is apparent that the reports which Dr. Kenfield received from the other psychiatrists were of events which had transpired a short time before, and we know of no reason why the oral reports of such incidents should be any less trustworthy than a written report would be under those circumstances. We also observe that the advisory committee note to Federal Rule of Evidence 703, quoted in *Ward*, mentioned that doctors rely upon statements from relatives as well as patients. We find no error in the admission of the testimony concerning the mother's statement to the doctor. Such statements are often absolutely necessary to be able to treat a patient, and is especially necessary under circumstances such as those herein where the patient would not communicate with the doctor. We find that the testimony to which respondent objects was properly received by the trial court and that Dr. Kenfield was entitled to rely upon that information in making his diagnosis.

■■ Respondent also contends that the concept of using his silence, and it is to be noted that the respondent refused to talk to the examining psychiatrist prior to the May 23 hearing, violates the fundamental principle contained in the fifth amendment, to-wit: his right to remain silent. We point out that this is not a criminal proceeding and that the failure of a person to communicate may well be evidence of a mental disorder. Also contrary to this argument, the fact that the respondent stated that he would now eat and take fluids on the morning of the May 23 hearing is not of itself an indication that the patient had recovered from either his physical or mental problems.

■■ Respondent next contends that there was no evidence that he was dangerous to others. We note initially that the trial court did not find at the first hearing that respondent was dangerous to others. However, as we

have previously held, there was proper information before the court from which it could have concluded that respondent had acted violently towards others as recently as the time of his admission to Downey.

■■ As to respondent's danger to himself or inability to care for himself, it is patent from this record that respondent had, at the time of the hearing on May 23, just consented to eat food and drink fluids after an unexplained refusal to do so for at least 11 days or more. He had been uncooperative and refused to talk almost the entire time and Dr. Kenfield was still of the opinion that he was confused and disoriented, based on the meager conversation which the doctor was able to have with the respondent on the morning of the hearing. Likewise, at the June 20 hearing, respondent himself made several attempts to speak to the court but was unable to do anything but ramble incoherently and finally just completely stopped talking in the middle of a sentence. All of the doctors were of the opinion that Mr. Sharkey needed hospitalization. We find this to be clear and convincing evidence that respondent was indeed dangerous to, and unable to care for, himself. That is sufficient basis to sustain the order committing respondent as a person in need of mental treatment. (See *In re Love* (1977), 48 Ill. App. 3d 517, 363 N.E.2d 21.) We are likewise of the opinion that the evidence herein sufficiently supports the trial court's finding that respondent's danger to himself and inability to care for himself was caused by his mental disorder. We therefore hold that the trial court properly determined that respondent was a person in need of mental treatment.

■■ We now turn to the contention that the trial court erred in not exhausting reasonably available, less restrictive treatment alternatives prior to ordering the respondent to Downey. Specifically, this contention is that the State should have shown that the respondent could not have returned home. We find this argument to be without merit as the court specifically found that the respondent was in need of hospitalization. This same argument was presented in *People v. Ralls* (1974), 23 Ill. App. 3d 96, 101, 318 N.E.2d 703, 707, where the court noted:

> "Section 9—6 of the Mental Health Code (Ill. Rev. Stat., ch. 91½, par. 9—6) provides alternative terms of treatment. The court was justified in finding that the defendant was in need of hospitalization, and therefore, it was not error for the court to fail to give consideration to placing the defendant with a relative."

In addition, the placing of the respondent in the less restrictive treatment alternative of his father's home would have been most inappropriate, under the facts of this case, as the respondent's father signed the original petition for commitment.

■■ The last contention of the respondent is that he was denied the effective assistance of counsel. In support of this argument the respondent

contends that his counsel at the May 23 hearing should have sought an independent psychiatric examination. We find no authority or requirement for this under the Mental Health Code. Respondent also suggests that the failure of his hearing counsel to object to the alleged hearsay testimony previously discussed is indicative of her incompetence. As we have stated, this contention is without merit. Examination of the complete record indicates that the respondent did, in fact, receive the effective assistance of counsel. The public defender did as much for the respondent as could reasonably be expected. *People v. Gerich* (1974), 22 Ill. App. 3d 575, 317 N.E.2d 724.

The record in this case and the applicable law amply supports the trial court's ruling as to the need of mental treatment by the respondent and his hospitalization. Accordingly, the judgments of the circuit court are affirmed.

Affirmed.

NASH and RECHENMACHER, JJ., concur.