*In re* QUINCE COLLINS.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* QUINCE COLLINS, Respondent-Appellant.)

Fourth District    No.17125

Opinion filed November 25, 1981.

Linda Susan Ganski, of Illinois Guardianship & Advocacy Commission, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Robert J. Biderman and Denise M. Paul, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLS delivered the opinion of the court:

The mandate of State mental health legislation is unequivocal: in an involuntary admission, an examining physician or psychiatrist must first *personally* inform the patient of his rights or that examiner will not be permitted to testify as to the patient's admissions at any subsequent court hearing.

The intent and direction of the legislature here is manifest—yet such command has clearly been flouted in this case.

We reverse and remand.

Respondent appeals his involuntary admission to the Department of Mental Health. The premier issue before this court is whether the order finding him subject to involuntary admission must be reversed because the trial court failed to suppress testimony of the examining physician and psychiatrist for their failure to comply with the statutory requirement that they personally inform respondent of his right to remain silent and that any statements he made could be disclosed at a court hearing on the issue of involuntary admission.

On February 27, 1981, a petition for involuntary admission was filed

in the Sangamon County circuit court. Prior to trial, respondent moved to suppress the testimony of the examining physicians on the grounds that they had not informed him of his rights prior to the examination. The trial court reserved ruling on the motion pending testimony on the subject.

Randall von Lisky, downstate coordinator of the Governor's Office of Interagency Cooperation, testified that on February 20, 1981, respondent appeared in his office asking to see the governor. After being advised by a receptionist that respondent appeared dangerous, von Lisky called for additional security.

Respondent appeared to be nervous, upset, and intense. Respondent told von Lisky that in 1965 his stepfather had murdered his grandmother. According to his grandmother's will, respondent was to receive $250,000 which was held in trust until he came of age. When respondent was 21 years old and asked for the money, his stepfather denied its existence. Respondent could no longer remember the name of the bank or the account number in which the funds were placed. Because of his lack of money, respondent was forced to commit an armed robbery for which he was sent to prison. Upon his release from prison he was placed in an alternative prison program at Northeastern University where he was subjected to mind experiments involving drugs.

Respondent heard voices which told him to rape and murder people. He was frustrated by the governor's lack of response to his repeated cries for investigation. Respondent then told von Lisky that he was going to remain in Springfield until he saw the governor and that if nobody listened to him he would obtain a gun and "take care" of unnamed officials. Respondent also told von Lisky that there was a little man with a television camera in respondent's eye who was filming the interview.

Respondent agreed to talk to medical personnel, and the governor's security staff transported him to McFarland Zone Center. Respondent's cooperation was voluntary and no physical restraints were used.

Aziz Salama, a physician and psychiatrist at the Zone Center, testified that he was present during an examination of the respondent on February 20, 1981. A certificate signed by Dr. Salama also indicates that he conducted a second examination on February 23. Prior to the initial intake examination, Salama ascertained that a nurse who admitted respondent to the Zone Center informed him of his rights. Salama was not present when these rights were read to respondent. Salama testified that respondent appeared to understand his rights and was willing to talk to personnel. Respondent did not ask for a lawyer.

Dr. Williams conducted the examination. Respondent retold the story about his grandmother and his inheritance. In addition, he stated that while in the army, drugs were used on him. As a result respondent now

had "bionic" properties. The voices in his head also told him to kill white children and white people.

Based on his observations and clinical knowledge, Dr. Salama diagnosed respondent as paranoid schizophrenic. He concluded that respondent was in need of hospitalization, was mentally ill, and that because of the illness respondent could reasonably be expected to inflict serious damage either upon himself or someone else without treatment. Salama also stated that he had considered other forms of treatment and found them to be inappropriate.

Upon questioning by the court, Salama acknowledged that though his signature appeared on the certificate indicating that Salama had *personally* informed respondent of his rights, Salama admitted that he did not personally advise respondent of these rights. The only thing Salama told respondent at the first interview was that respondent did not have to talk to the doctors. There was no testimony with regard to whether Salama informed respondent of any rights at the subsequent interview on February 23.

Dr. Nelson Williams, a second-year psychiatric resident, testified that he examined the respondent with Dr. Salama on February 20, 1981. Williams did not read respondent his rights because he ascertained that the admitting nurse had read the rights to respondent. It was Williams' opinion that respondent understood his rights, did not ask for an attorney, and voluntarily spoke with the doctors. Williams admitted that although his signature also appeared on the certificate acknowledging that he had *personally* informed respondent of his rights, Williams nevertheless had never done so.

In addition to the other delusions previously related by the witnesses, respondent told Williams that the governor had conspired with Northeastern University officials and his family to bilk him out of his inheritance through a scheme involving government sponsored drug experiments. The experiments caused respondent to hear voices which told him to commit violent acts, vandalize property of white people, and kidnap and murder white children. Williams' diagnostic opinion of respondent's condition and the need for hospitalization was identical to that of Dr. Salama.

Respondent was called under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). Without recounting all of his testimony, suffice it to say that he corroborated in some detail the incidents previously testified to by von Lisky and the doctors, together with additional observations consistent with the tenor of his previous statements. At the close of the testimony, the trial court denied the motion to suppress the doctors' testimony and ordered respondent hospitalized in

the Department of Mental Health and Developmental Disabilities. Notice of appeal was timely filed.

The Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1979, ch. 91½, par. 3—208) provides:

"Whenever a petition has been executed pursuant to Section 3—507, 3—601 or 3—701, and prior to this examination for the purpose of certification of a person 12 or over, *the person conducting this examination shall inform the person being examined* in a simple comprehensible manner of the purpose of the examination; that he does not have to talk to the examiner; and that any statements he makes may be disclosed at a court hearing on the issue of whether he is subject to involuntary admission. *If the person being examined has not been so informed, the examiner shall not be permitted to testify at any subsequent court hearing concerning the respondent's admission.*" (Emphasis added.)

Section 3—807 of the Code which concerns the testimony of the psychiatrist or the clinical psychologist also provides:

"No respondent may be found subject to involuntary admission unless at least one psychiatrist or clinical psychologist who has examined him testifies in person at the hearing. The respondent may waive the requirement of such testimony subject to the approval of the court." Ill. Rev. Stat. 1979, ch. 91½, par. 3—807.

The aforementioned statutory directives, which find no counterpart in the Mental Health Code of 1967 (Ill. Rev. Stat. 1977, ch. 91½, par. 1—1 *et seq.*), became effective January 1, 1979. Under the prior Mental Health Code of 1967, a person admitted to an institution for an examination under the Act was only entitled to a written statement explaining his right to a hearing and describing the patient's rights at such a hearing. (Ill. Rev. Stat. 1977, ch. 91½, par. 3—8.) The drafters of the present Mental Health and Developmental Disabilities Code, however, felt that greater protections were needed, and section 3—208 was included for the express purpose of "extend[ing] the privilege against self-incrimination to persons 12 or over undergoing certification examinations." Governor's Commission for the Revision of the Mental Health Code of Illinois, Report, at 38 (1976) (hereinafter Commission).

Notwithstanding the drafter's intended purpose, the Commission also noted in its comments that the new section "expands Illinois case law, which does not now give the individuals such a privilege." (Governor's Commission for Revision of the Mental Health Code of Illinois, Report, at 38 (1976).) Under prior case law, respondent did not have the right to refuse to cooperate with psychiatrists in an examination or to testify at a hearing under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). (*People v. English* (1964), 31 Ill. 2d 301, 201 N.E.2d 455;

*People ex rel. Keith v. Keith* (1967), 38 Ill. 2d 405, 231 N.E.2d 387.) In those two cases the supreme court held that respondents were required to make disclosures in examinations or to give testimony which revealed their mental condition. The privilege, the supreme court ruled, extended only to matters which implicated individuals in criminal involvement. The Commission's comments to the present statutory provision appear, however, to extend the "privilege" beyond statements involving criminal conduct to encompass any statements of any nature concerning mental condition as well. In short, a respondent can completely refuse to speak with the examining physician or psychiatrist.

With this short legislative background, irrespective of its wisdom (to which we will return), we now examine the case at hand. The statutory language is plain. It requires the examining physicians to *personally* inform the respondent of his rights to remain silent and that any statements he makes may be used in a hearing to determine whether he should be subject to involuntary admission. *It is difficult, if not impossible, to understand how so simple a directive can be ignored by mental health personnel!*

The record is clear that both doctors were examining physicians but that neither personally informed respondent of his rights—even though they affixed their signatures to certificates verifying that they did, under penalty of perjury (Ill. Rev. Stat. 1979, ch. 91½, par. 3—203). We hold that the statutory directive admits of only one interpretation: the examining physician must *personally* inform respondent of his rights.

■■ Just as the initial statutory requirement is clear, so is the result which necessarily obtains if the statute is violated. If the doctors do not personally inform respondent of his rights, their testimony, in its entirety, is *barred*. If there is no testimony of a psychiatrist or psychologist who has examined the respondent before the court, a respondent may not be found subject to involuntary admission. That is the bottom line. *In re Rizer* (1980), 87 Ill. App. 3d 795, 409 N.E.2d 383.

■■ Despite these flagrant shortcomings, the State argues in the first instance that respondent has waived the issue by failing to renew his motion to suppress the doctors' testimony after evidence was heard on the question of the extent to which they personally informed respondent of his rights. We disagree. Respondent filed an *in limine* motion on exactly that point. Prior to the hearing, however, there was no evidence from which the court could determine whether the allegations of the motion were true. Since this was a bench hearing, it was appropriate for the trial court to take testimony on the matter during the course of the hearing as opposed to requiring proof prior to the hearing. Irrespective of the fact that respondent could have renewed his objection to the testimony of the doctors at the time it was given in open court, the issue had been reserved

by the trial court and was therefore properly before the court when it refused to suppress the testimony. To require respondent to make a continuing objection under the circumstances would be a superfluous act, especially where all of the parties to the proceeding, including the trial court, were aware that this was the only substantial basis upon which respondent was relying to avoid commitment.

██ We also reject the State's contention that respondent has waived the issue because respondent failed to obtain a ruling by the trial court with regard to Dr. Williams' testimony. Though it is true that in its ruling, the trial court makes reference only to the testimony of Dr. Salama, it is without doubt that the trial court's ruling encompassed the testimony of both doctors since their testimony was substantially identical, both to the content of defendant's statements and in the extent to which they did not inform respondent of his rights.

██ We must also reject the State's contention that Dr. Salama's vague statement to the respondent, that he did not have to talk to the doctors or that the admitting nurse's recitation of respondent's rights to him, constituted substantial compliance with the statute. The statutory language is plain. It does not suggest, explicitly or otherwise, that the doctors may only partially comply with their statutory duty or delegate that duty to another. It is just as obvious that compliance with the statutory directives would neither work undue hardship upon the doctors nor subvert, or otherwise protract, the process by which diagnoses can be reached which ultimately result in a commitment.

The loss of freedom following an involuntary commitment proceeding is neither an insignificant matter nor is it an isolated occurrence. During fiscal year 1981, 7,464 petitions for involuntary admission were granted by trial courts throughout the State.[1]

Though not raised by respondent, we also note that the record is devoid of any indication that mental health personnel complied with at least one other provision of the Code. Section 3—810 provides:

> "Before disposition is determined, the facility director or such other person as the court may direct shall prepare a report including information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, a preliminary treatment plan, and any other information which the court may order. The treatment plan shall describe the re-

---

[1] This figure represents the number of petitions granted, not the number of people actually hospitalized. Some duplication is represented in the figure because some individuals are released and subsequently recommitted after exhibiting sufficiently aberrant characteristics to warrant rehospitalization. Division of Information Services, Department of Mental Health and Developmental Disabilities (1981).

spondent's problems and needs, the treatment goals, the proposed treatment methods, and a projected timetable for their attainment. If the respondent is found subject to involuntary admission, the court shall consider the report in determining an appropriate disposition." (Ill. Rev. Stat. 1979, ch. 91½, par. 3—810.)

The aforementioned statute requires that the trial court consider this report prior to any disposition. Nowhere in the record is there any evidence that such a report was ever prepared or considered by the trial court. Though this issue is not raised by respondent, and is not necessary to the disposition of this case, it is but one further indication that certain staff within the Department of Mental Health are performing their duties with either callous or blithe disregard for the rules. Such a situation cannot be condoned.

The parties also take vastly divergent positions with regard to the nature of the warnings required by the statute. Respondent argues that mental health warnings should be equated with *"Miranda"* warnings. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) While we disagree with respondent's position (*In re Ottolini* (1979), 73 Ill. App. 3d 971, 392 N.E.2d 736), this issue ignores a more fundamental question. Do the statutory requirements effectively assure the legislative objective?

As noted earlier, the drafters of the new code concluded that section 3—208 significantly expands the ability of respondents to avoid examination by mental health personnel. While it may well be said, in the criminal context, that the requirement of warnings affords greater *protections* to an actual or potential defendant, that same conclusion is neither automatic nor appropriate in the context of mental health proceedings for involuntary commitment.

Mental health proceedings are vastly different from proceedings under the Criminal Code. They are for the benefit of both the public and the patient. In *In re Stephenson* (1977), 67 Ill. 2d 544, 554, 367 N.E.2d 1273, 1276-77, our supreme court stated that the Mental Health Code of 1967:

> "* * * represents a serious attempt to provide beneficial treatment and care for the mentally ill with the minimum ostracism and confinement consistent with protection of the public. Our free society's interest in prospectively protecting itself from dangerous or harmful conduct, standing alone, suffices to justify only minimal infringements upon an individual's personal liberty. A high value has also been placed, however, on our society's obligation to protect and care for those of its members unable to protect or care for themselves. It is important to a concerned and humane society

that the margin of error be held to a minimum in denying such protection and care. Moreover, the individual involved, as well as society, has a strong interest in getting needed care or treatment which will enable him to function normally * * *."

The court in *Ottolini* also quoted with approval language from *People v. Sansone* (1974), 18 Ill. App. 3d 315, 322, 309 N.E.2d 733, 738, which stated:

"Inherent in civil commitment proceedings is the promise of the State, under a *parens patriae* theory, that the person who is being deprived of his liberty will receive treatment. * * * The procedures set forth in the Illinois Mental Health Code are a legislative recognition that civil commitment is a deprivation of personal liberty, and their purpose is to provide adequate safeguards against unreasonable detention and commitment."

Given these considerations, psychiatric examinations must be distinguished from police interrogations. Examinations by qualified physicians, albeit employed by the State, are not inherently prejudicial and ordinarily do not pose a great potential for abuse. Medical diagnostic procedures and conferences are purely investigative and fact finding. They do not adjudicate, indict, punish, or impose legal sanctions. The value of the process would be severely undermined by anything which inhibits the free exchange of views. *Ottolini.*

While we are not unmindful of the fundamental liberty rights at issue, and that certain due process protections must be afforded so that these fundamental rights are not trampled in the rush to protect society at the expense of the individual, the question remains whether informing an individual of his right to remain silent is an appropriate way to assure protection of those rights.

By definition, a person involuntarily committed lacks the capacity to exercise his own volition in favor of or against commitment. That being true, it follows that advising a person, who fits this definition, of his rights would be a useless act because the individual who is not in command of his faculties could certainly not understand or appreciate the nature of his surroundings or the processes which have been invoked to accord him treatment. In short, such a person could not make a rational or voluntary (as that word is understood in its criminal sense) decision as to whether he should talk to the attending physicians.

Three illustrative situations merit special attention:

A. If the individual is mentally unstable and does not understand his rights as they are presented to him, advising him of those rights, in the first instance, is meaningless.

B. In the second example, if the individual is mentally ill and understands his rights and voluntarily talks to doctors, one must conclude that he understands he needs help and that it is in his best interest to talk. Hence, he would have the capacity to appreciate his situation and

presumably would voluntarily commit himself rather than force the State to proceed against him on an involuntary petition.

C. Finally, there is the situation in which the mentally ill person "understands" his rights and still refuses to talk to physicians. If he can avoid making any statements to the doctor (contra, *People v. English* (1964), 31 Ill. 2d 301, 201 N.E.2d 455), then the attending physicians will have to look solely to outside sources or rely on nonverbal conduct of the respondent to arrive at a diagnosis, thereby making the diagnostic process much more difficult. *People v. Sharkey* (1978), 60 Ill. App. 3d 257, 376 N.E.2d 464.

The common denominator in each of these examples is that the warnings which must accompany an examination are totally ineffective to accomplish the purpose which the drafters intended. Moreover, irrespective of these warnings, a respondent's right against self-incrimination as to statements which pertain solely to criminal matters is already guaranteed by section 2—100 of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1979, ch. 91½, par. 2—100), which states that no recipient of services shall be deprived of any rights, benefits, or privileges guaranteed by law or the constitutions of this State or the United States, and by prior case law. *English; Keith.*

In addition, if the drafters' interpretation is correct, serious questions are raised as to the efficacy of the practice of calling respondents under section 60 of the Civil Practice Act. It is patently contradictory to conclude that a respondent can totally avoid examination by the physician and yet be hailed into court to testify, presumably in some detail, as to aspects of his mental condition while the doctors are sitting in the gallery forming diagnostic conclusions as to the state of respondent's mental health. If he can still be forced to testify, his prior decision not to speak is readily circumvented since expert testimony concerning the state of respondent's health may certainly be based upon facts introduced in evidence at a trial or hearing. *Skalon v. Manning, Maxwell & Moore, Inc.* (1970), 127 Ill. App. 2d 145, 262 N.E.2d 146.

A final point of concern is the Commission's statement in its comments to section 3—208 that it should be "stressed that this section will not nullify the legality of a certificate executed by an examiner who has not given the required warning, [it] only prevents his testifying in court." Governor's Commission for Revision of the Mental Health Code of Illinois, Report, at 38 (1976).) We fail to see how this conclusion, even if true, has any substantive effect under the statutory scheme as set forth in the present Code. This case represents an object lesson in that regard.

■■ It is undisputed by the parties that there was more than sufficient evidence from which to conclude that respondent was mentally ill and in need of hospitalization and treatment. Yet, the failure of the doctors to personally inform respondent of his rights absolutely precludes not only

their testimony, but respondent's involuntary admission, since the testimony of a doctor is deemed, under the Code, to be essential. Irrespective of the continuing "validity" of the certificates, they are not substantive evidence and may not be the sole basis upon which a respondent may be committed to the department despite the fact that the certificates accurately describe respondent's mental condition which requires commitment for protection of both respondent and the public. See *In re Evans* (1980), 86 Ill. App. 3d 263, 408 N.E.2d 33.

While we have severe reservations as to the efficacy of the statutory scheme provided in the present Mental Health and Developmental Disabilities Code, we nevertheless conclude that the conduct of mental health personnel in this case fell below any threshold level of compliance with the clear and unambiguous requirements of the statute.

Accordingly, the judgment of the Sangamon County circuit court is reversed and remanded.

Reversed and remanded.

GREEN and WEBBER, JJ., concur.