*In re* MICHAEL GERMICH.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* MICHAEL GERMICH, Respondent-Appellant.)

First District (1st Division)    No. 80-2612

Opinion filed December 28, 1981.

James J. Doherty, Public Defender, of Chicago (Michael Woloshin and Judith A. Stewart, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Glenn Carr and Karen J. Dimond, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McGLOON delivered the opinion of the court:

After a hearing, respondent Michael Germich was found to be in need of mental treatment and subject to involuntary admission. The trial court ordered him hospitalized in the Department of Mental Health and Developmental Disabilities. Respondent appeals and contends (1) the trial court improperly considered hearsay evidence and (2) the trial court's finding was based on an improper ground.

We affirm.

On August 14, 1980, a petition was filed asserting that respondent was mentally ill and unable to provide for his basic physical needs so as to guard himself from serious harm. The petition was accompanied by two supporting certificates. A hearing on the petition was held on September 3, 1980.

John Germich, respondent's father, testified that respondent had been involuntarily hospitalized on prior occasions. On July 2, 1980, he spoke with respondent and told him that he had received a call from the F.B.I. The agent told Mr. Germich that respondent had visited the F.B.I. offices and informed the agent that he knew he was under surveillance. Respondent suggested that the F.B.I. investigate others, including his father. The agent stated that respondent was very belligerent and "borderline violent." After Mr. Germich relayed this conversation to respondent, respondent stated that he did not want to return to the hospital and in the event he were rehospitalized, he would "get even."

Douglas Bork was head resident advisor at the dormitory where respondent resided during the summer of 1980. He testified that he saw respondent several times in the dormitory and neighborhood. Bork observed that respondent wore flannel clothes all summer and it appeared that respondent neither changed nor washed these clothes as they developed an objectionable odor as time passed. Bork visited respondent's room on August 2, 1980. He saw five brown shopping bags filled with rotten food and trash. Food was spilled on the desk and rice and broken glass were strewn on the floor. The room was infested with insects and smelled like rotten fruit. Bork further testified that respondent resided in the room until he was hospitalized in mid-August.

Faith Whitaker worked in the main lounge of the residence hall. She testified that on two occasions she saw respondent pinching himself and responding to the pinches by flinching and saying, "Ouch." Respondent would also talk to himself. On one occasion, respondent may have been talking on a nearby phone, but Ms. Whitaker did not see a phone receiver in his hand.

Dr. Chun Ching Tsai, a psychiatrist qualified to testify as an expert witness, stated that he saw respondent daily since respondent's admission to the Illinois State Psychiatric Institute on August 13, 1980. Dr. Tsai observed that respondent was suspicious and agitated. During the first several days of his hospitalization, respondent would not speak with anyone and when Dr. Tsai would try to examine him, respondent would say, "Don't touch me." Rather than responding to Tsai's questions concerning respondent's past, respondent would reply that his past was a private matter. Respondent also refused to answer questions about his plans for the future and would shower and change clothes only at the request of the hospital staff. Dr. Tsai further testified that respondent was suspicious, deluded and irrational and that his conduct was influenced by his deluded thinking.

Dr. Tsai diagnosed respondent as a paranoid schizophrenic at the psychotic level. He based his diagnosis, in part, on his personal observation and examination. He also considered hospital records compiled during respondent's four prior commitments, information from respondent's father and the hospital staff, and information compiled by the intake staff after the staff interviewed Mr. Bork and others who brought respondent to the hospital. The records from previous hospitalizations indicated that respondent's behavior during those periods was similar to that exhibited during his current hospitalization. The report prepared by the intake staff indicated that respondent acted strangely, was withdrawn, asked peculiar questions and believed people were trying to harm him. It also appeared to the intake staff that respondent had not been eating properly.

Dr. Tsai further testified that if respondent were released from the

hospital, his physical condition would deteriorate and he could possibly harm himself or others. Tsai emphasized that respondent would not be able to feed, clothe, or otherwise care for himself due to his mental condition. Based on the severity of respondent's illness and respondent's failure to follow through with out-patient treatment programs in the past, Dr. Tsai believed that in-patient treatment was required.

Respondent testified that he did not need psychiatric treatment or hospitalization. He stated that his inability to care for his room was unimportant. He had no place to live if he were discharged, but did not believe this was a necessity. In response to the questions, "Do you have any money? Are you able to buy food?" respondent replied, "What relevance has that to do with it?"

The trial court found respondent subject to involuntary admission on the ground that he was unable to provide for his basic physical needs and unable to guard himself from serious harm.

First, respondent contends that in finding him in need of mental treatment, the trial court improperly considered hearsay testimony. Specifically, he maintains that Dr. Tsai's opinion which was based on the intake staff's report and Tsai's testimony regarding the contents of that report were hearsay and therefore inadmissible.

In *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171, the court stated that medical reports prepared by others may be used by experts in formulating an opinion and the expert may testify to the contents of the reports so long as the records are a type commonly used and relied upon by the medical profession. Relying on *Ward*, the court in *People v. Rhoads* (1979), 73 Ill. App. 3d 288, 314-15, 391 N.E.2d 512, 531, reached a similar conclusion and noted that the following cases were in accord with its interpretation of *Ward*: *People v. Cooper* (1978), 64 Ill. App. 3d 880, 381 N.E.2d 1178; *People v. Sharkey* (1978), 60 Ill. App. 3d 257, 376 N.E.2d 464; *Clemons v. Alton & Southern R.R. Co.* (1977), 56 Ill. App. 3d 328, 370 N.E.2d 679; *People v. Espinoza* (1977), 54 Ill. App. 3d 36, 369 N.E.2d 325; and *Smith v. Williams* (1975), 34 Ill. App. 3d 677, 339 N.E.2d 10.

Here, Dr. Tsai testified that the intake staff's reports were customarily relied upon by psychiatrists when diagnosing patients. Therefore, Dr. Tsai could rely upon such a report in formulating his opinion on respondent's mental state and could testify to the contents of the report. Thus the trial court did not err in considering Dr. Tsai's testimony on these matters.

Second, respondent contends that the sole basis for the trial court's finding that he was subject to involuntary commitment was his refusal to disclose future plans to the attending psychiatrist. He maintains that this was an improper basis upon which to order commitment. He further maintains that pursuant to section 3—208 of the Mental Health and

Developmental Disabilities Code (Ill. Rev. Stat. 1979, ch. 91½, par. 3—208), he had the right to withhold any and all such information.

■■ Our review of the record reveals that respondent's commitment was based upon the existence of a mental disorder which rendered respondent, "unable to provide for his basic physical needs and unable to guard himself from serious harm." This is a proper ground for involuntary commitment. (Ill. Rev. Stat. 1979, ch. 91½, par. 1—119(2).) The fact that respondent failed to disclose his future plans to the attending psychiatrist Dr. Tsai was only one factor cited by the trial court in support of the aforementioned conclusion.

■■ We further find that section 3—208 of the Mental Health and Developmental Disabilities Code is not applicable to the instant case. The statute provides, in part, as follows:

> "Whenever a petition has been executed pursuant to Section 3—507, 3—601 or 3—701, and prior to this examination for the purpose of certification of a person 12 or over, the person conducting this examination shall inform the person being examined in a simple comprehensible manner of the purpose of the examination; that he does not have to talk to the examiner; and that any statements he makes may be disclosed at a court hearing on the issue of whether he is subject to involuntary admission." (Ill. Rev. Stat. 1979, ch. 91½, par. 3—208.)

However, these requirements apply only where the immediate purpose of the examination is certification and do not apply to the traditional therapist-patient relationship. (See *In re Rizer* (1980), 87 Ill. App. 3d 795, 409 N.E.2d 383, citing Governor's Commission for Revision of the Mental Health Code of Illinois, *Report*, pt. 1, comment, at 38 (1976).) Here, Dr. Tsai did not conduct a certification examination. He saw respondent on a daily basis and acted as respondent's therapist. Thus, the situation presented in this case is distinguishable from that contemplated by 3—208 and said statute is inapplicable.

Respondent further contends that the State did not show by clear and convincing evidence that respondent was subject to involuntary admission. We have reviewed the record and respondent's brief carefully and find this contention to be without merit.

For the foregoing reasons, we affirm the order of the circuit court of Cook County.

Order affirmed.

CAMPBELL, P. J., and O'CONNOR, J., concur.