*In re* VIC LEMAR ROGERS (The People of the State of Illinois, Petitioner-Appellee, v. Vic Lemar Rogers, Respondent-Appellant).

Fourth District   No. 4—84—0763

Opinion filed May 22, 1985.

Jeff Plesko and Maureen M. McCord, both of Guardianship & Advocacy Commission, of Champaign, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Robert J. Biderman and Timothy J. Londrigan, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

Following a hearing in the circuit court of Champaign County, respondent was involuntarily admitted to a mental health facility pursuant to the provisions of the Mental Health and Developmental Disabilities Code. (Ill. Rev. Stat. 1983, ch. 91½, pars. 3—700 through 3—819.) The court found that respondent was a person subject to involuntary admission because he was mentally ill and, because of his illness, was reasonably expected to inflict serious physical harm upon himself or another in the near future. (Ill. Rev. Stat. 1983, ch. 91½, par. 1—119(1).) The court ordered that respondent be hospitalized at the Adolf Meyer Zone Center in Decatur. Respondent now appeals, contending that the State failed to prove he was a person subject to involuntary admission.

■■ ■ The State was required to prove the necessary allegations of the petition by evidence that is clear and convincing. (*In re Stephenson* (1977), 67 Ill. 2d 544, 367 N.E.2d 1273.) On appeal, the trial court's determination will not be reversed unless it is manifestly erroneous. In civil commitment cases, the medical science of predicting the future is inexact, so that a reviewing court will normally uphold a commitment order where there is reasonable expectation that the respondent might engage in dangerous conduct. (*In re Johnston* (1983), 118 Ill. App. 3d 214, 218, 454 N.E.2d 840; *In re Powell* (1980), 85 Ill. App. 3d 877, 880, 407 N.E.2d 658, 660.) The reviewing court cannot set aside the decision of the trial court because it, applying the requisite standards, would have ruled differently. (*In re Mazzara* (1985), 133 Ill. App. 3d 146.) Bearing these standards in mind, we consider the facts of this cause.

A petition for involuntary admission was filed on September 26, 1984, alleging that respondent was mentally ill and, because of his illness, was reasonably expected to inflict serious physical harm upon himself or another in the near future. The petition, signed by William Rogers, respondent's brother, stated that on that date the respondent had threatened to kill him if he did not cut his hair off, because his hair had curl, and that respondent had scissors in his hand at the

time. The petition further asserted that respondent said many times in the previous several weeks that he is God; that respondent struck petitioner several times on September 26, 1984; and that respondent had been treated for mental illness for more than 10 years, and was diagnosed as a paranoid schizophrenic. The petition was accompanied by the necessary physician's certificates stating that respondent was a person subject to involuntary admission. See Ill. Rev. Stat. 1983, ch. 91½, par. 3—702.

A hearing on the petition was held on October 4, 1984. Dr. Arthur Traugott, a psychiatrist, testified that the respondent was examined on September 26, 1984, by Dr. Roth at the Mercy Hospital emergency room. Dr. Roth had informed Traugott that the respondent denied the allegations of the petition and was able to keep himself composed during the examination. Dr. Traugott testified that he had been in contact with the State's Attorney's office, which had other evidence concerning respondent's dangerousness, and had received some information from a mental health center indicating that respondent had a mental illness for which he had been treated in the past. Traugott testified he informed Dr. Roth that he would accept respondent as an involuntary patient; as the respondent was being moved to the unit he became disruptive and Dr. Traugott ordered him placed in leather restraints and under medication. On the morning of September 27, Dr. Traugott spoke to the respondent, who insisted that all he needed was the Bible. Respondent indicated that he had received treatment for mental illness while in the penitentiary, and that he had suffered from auditory hallucinations, and had been placed under medication at that time.

According to Dr. Traugott, the respondent refused medication from approximately the third day of hospitalization and declined to cooperate with him beginning on September 28, 1984, when respondent learned that Dr. Traugott did not intend to discharge him from the hospital. Dr. Traugott had considered the respondent's past medical history in determining his diagnosis. He noted that the reports indicated that respondent had been sent to prison for aggravated assault, and began having auditory hallucinations while in prison and struck a guard, apparently as the result of a command or direction from the voice that he was hearing. The respondent was given regular medication and the symptoms of his mental illness improved. Upon his release from prison, respondent continued a follow-up program at a mental health center and received injections of medication until November 1983, when he reportedly discontinued taking the medication on his own. Thereafter, there were reports of disruptive incidents

with a teacher at Parkland College and a therapist at the mental health center, and then the respondent stopped going to the mental health center, leading to the present history of disruptiveness at home.

Dr. Traugott testified that the information in the reports documented the criteria for a diagnosis of paranoid schizophrenia, which he believed was accurate, including grandiose delusions that the respondent was God and should be treated as God. The doctor had seen the respondent writing, and observed that respondent had written on the paper, "I am God." He testified that in his opinion the respondent was reasonably expected to inflict serious physical harm upon himself or others in the near future as a result of his mental disorder. He opined that, based upon the respondent's previous response to medication and his ability to live reasonably well with others when he was on medication, the respondent's condition could be expected to stabilize after being on medication on a regular basis for a few months, and he could then be maintained on an outpatient basis. Because of the respondent's unwillingness to take medication, and the disruptive situation at home, Dr. Traugott believed the respondent required inpatient treatment.

Williams Rogers, respondent's 19-year-old brother and the petitioner herein, testified that on September 26, 1984, he was sleeping at his sister's house when the respondent came in and began yelling and telling him to cut his hair. The respondent struck him, and talked about killing him, while carrying scissors in his hand. William testified that the respondent talked seriously about being God all of the time.

On cross-examination, William described an incident involving respondent several days prior to September 26. William and his brother Jimmy, age 26, talked among themselves and decided to seriously hurt the respondent for yelling at their mother. In the incident, Jimmy had chains, one of which was used to strike the respondent. Jimmy also drove a car and, according to William, the respondent stood in the middle of the street and jumped on top of the car. William testified that Jimmy was not trying to hit the respondent, but did not attempt to stop the car. The fight stopped before the police arrived. Later that day, William, accompanied by Jimmy and another person, went to the apartment where the respondent was staying to get their mother. He denied threatening respondent at that time. William further testified that he thought they might actually have to kill the respondent.

The respondent testified in his own behalf. He stated that he had lived in Champaign since 1969. He was away in the Marine Corps from 1972 through 1976. For the last few months he had been living

with his mother. He testified that his mother had had a nervous breakdown in 1964, and that she continued to have problems taking care of herself. He testified that he had put the water bill in his name, and that he paid the water bill, bought his mother food, and advised her on how to pay her rent. He said that his brothers, Jimmy and William, asked his mother for money, sometimes helping her out, but also borrowing money from her when she could not afford it, and wasting it on things like putting curl in their hair. He said his brothers would stay with their mother for a few days at a time. He acknowledged that he had a bad temper and said that he yelled at his mother about allowing his brothers to take advantage of her. The respondent testified that his brothers had attacked him on September 22, 1984, and threatened him later the same night. He then started carrying the scissors he used to trim his mustache, in order to be able to protect himself.

As to the incident of September 26, 1984, the respondent said his brother William was asleep when he entered the house. The respondent slapped William "a couple times." Respondent denied threatening to kill William and said he "just asked him if he wanted to die."

The respondent denied telling people that he was God, and said that religion had completely cured him of his problems. The respondent told the court that his brother Jimmy should be evaluated, rather than himself. He said that he went to the police station on September 26, 1984, after slapping William, to press charges: "I could have killed him, because he was just laying there, but I didn't want to do it, because this is my brother and I love and care for him, but—I don't know—I was just—you know—fearful they might try something else, and then I might have to kill him. So that's why I went to the police department and put in a report."

On cross-examination, the respondent declined to answer whether God had ever directly spoken to him. He did say that "the spirit speaks to us in many ways and the spirit is within us." He acknowledged that when he was in prison he heard voices which "came from the spirit," and told him that they were going to do things to him and his family. As a result, he got into fights while in prison.

On redirect examination, respondent denied hearing such voices at the present.

At the conclusion of the evidence, the trial judge found it uncontradicted that the respondent was a paranoid schizophrenic, and so found. The judge was persuaded that the evidence showed, by clear and convincing proof, that respondent's illness led to a reasonable expectation that he would inflict serious harm upon himself or another

in the near future. The court found that the possibility of outpatient treatment was neither present nor realistic for the respondent, adjudged respondent a person subject to involuntary admission, and ordered that he be hospitalized in the Department of Mental Health and Developmental Disabilities.

Section 1—119 of the Code provides that a person is subject to involuntary admission if (1) he is mentally ill, and (2) because of his illness is reasonably expected to inflict serious physical harm upon himself or another in the near future. The respondent disputes the court's finding on each point.

■■ We first consider the respondent's claim that the State failed to establish that he is mentally ill by clear and convincing evidence. The respondent maintains that the certificate completed by Dr. Traugott to accompany the petition is patently defective, citing the language of *People v. Ralls* (1974), 23 Ill. App. 3d 96, 99-100, 318 N.E.2d 703, 706. Respondent argues that although the present Code requires that the examiner state "factual information relied upon in reaching a diagnosis," the requirement of specificity referred to in *Ralls* should still obtain. (See Ill. Rev. Stat. 1983, ch. 91½, par. 3—602.) He argues that Dr. Traugott testified that he was unable to give his customary mental status examination and, moreover, was unable to verify the physical examination performed on respondent by his medical student. Respondent now claims he is entitled to a current evaluation of his conduct and state of mind, and that Dr. Traugott's observation may not be equated to an examination.

As this court observed in *In re Collins* (1981), 102 Ill. App. 3d 138, 142-45, 429 N.E.2d 531, 535-37, the drafters of the present Code included section 3—208 (Ill. Rev. Stat. 1983, ch. 91½, par. 3—208) for the express purpose of " 'extend[ing] the privilege against self-incrimination to persons 12 or over undergoing certification examinations.' " (102 Ill. App. 3d 138, 142, 429 N.E.2d 531, 535.) Under prior case law, a respondent did not have the right to refuse to cooperate with psychiatrists in an examination. The comments to the present statutory provision suggest, however, that a respondent can completely refuse to speak with the examining physician or a psychiatrist. This feature was not a part of the law at the time of the *Ralls* decision. The circumstances presented herein recall one of the illustrative situations described in *Collins*:

> "C. Finally, there is the situation in which the mentally ill person 'understands' his rights and still refuses to talk to physicians. If he can avoid making any statements to the doctor (contra *People v. English* (1964), 31 Ill. 2d 301, 201 N.E.2d

455), then the attending physicians will have to look solely to outside sources or rely on nonverbal conduct of the respondent to arrive at a diagnosis, thereby making a diagnostic process much more difficult. *People v. Sharkey* (1978), 60 Ill. App. 3d 257, 376 N.E.2d 464." (102 Ill. App. 3d 138, 147, 429 N.E.2d 531, 538.)

Dr. Traugott necessarily had to rely on what observations he could make, along with those the staff reported, and the records furnished to him. Inasmuch as the respondent invoked his rights and refused to cooperate with the treating psychiatrist, we conclude that he was given all the evaluation he was due.

Respondent asserts that Dr. Traugott did not reveal why the respondent lost a recent job at the Merry Ann Diner, but only testified that respondent had lost the job, and that he was unaware of respondent's job history with the township. However, Dr. Traugott was not asked why the respondent lost his job at the diner, and respondent put on no further evidence about his job history. Given that respondent failed to cooperate with Dr. Traugott, we fail to see any merit to this criticism of his diagnosis.

Respondent also contends that there was no evidence that he was presently suffering from grandiose delusions or auditory hallucinations. Dr. Traugott's observation of the respondent's written notations, "I am God," and other testimony in this vein, suffice on the subject of delusions. Dr. Traugott described auditory hallucinations as a hallmark criterion of paranoid schizophrenia, but said respondent denied having them currently. We note that respondent apparently also had denied the allegations of the petition, but corroborated several allegations in his testimony. The respondent acknowledged in his own testimony that he had previously suffered from auditory hallucinations, and declined several times to answer the question of whether God spoke to him directly, finally answering that "the spirit speaks to us in many ways and the spirit is within us."

Further, upon review of the entire record, we would conclude that it was sufficiently shown that respondent suffers from a mental illness.

■ The respondent further argues that the State failed to establish that, because of his mental illness, he was reasonably expected to harm himself or others in the near future. Respondent acknowledged in his own testimony that his 19-year-old brother, William, did not attack him with a weapon during the September 22 incident between the brothers. Yet several days later, he entered a residence after seeing William's bicycle outside and, on finding William sleeping within,

slapped him several times and asked him whether he wanted to die. This, while respondent had scissors in his hand, which he admittedly had commenced carrying as a weapon. Although William indicated that he knew the respondent was not trying to hurt him when he hit him, we find that this incident supports the court's conclusion that the respondent was reasonably expected to do physical harm to himself or another in the near future.

Dr. Traugott testified that schizophrenia is a classic illness which is characterized by flare-ups and periods of quiescence. Although the refusal to take medication is sufficient to justify an order of commitment (*People v. Nunn* (1982), 108 Ill. App. 3d 169, 438 N.E.2d 1342), the respondent's refusal to take medication was not the basis of this order. The reports which Dr. Traugott had received suggested that the respondent had voluntarily ceased medication and that his condition had deteriorated to some extent as a result. The psychiatric testimony suggested that the respondent's condition could be stabilized given a period of regular medication on an inpatient basis.

Affirmed.

GREEN, P.J., and WEBBER, J., concur.