(No. 104443.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LAURENCE E. LOVEJOY, Appellant.

*Opinion filed September 24, 2009.—Rehearing denied November 23, 2009.*

Michael J. Pelletier, State Appellate Defender, Charles M. Schiedel, Deputy Defender, and Kim Robert Fawcett, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Joseph E. Birkett, State's Attorney, of Wheaton (Michael A. Scodro, Solicitor General, and Michael M. Glick and

Erin M. O'Connell, Assistant Attorneys General, of Chicago, of counsel), for the People.

CHIEF JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Justices Thomas, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Freeman specially concurred, with opinion, joined by Justice Burke.

## OPINION

Following a jury trial in Du Page County, defendant, Laurence Lovejoy, was convicted of the first degree murder of his 16-year-old stepdaughter, Erin Justice. Defendant was found eligible for the death penalty on two statutory grounds and sentenced to death. On direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603), defendant raises numerous claims of error occurring during the guilt and penalty phases of his trial. We reverse his conviction and sentence and remand for a new trial.

### BACKGROUND

The State's evidence demonstrated that in March 2004, Erin was a 16-year-old high school student and member of her high school track team. She lived in a Naperville apartment with her mother, Valerie Justice, and defendant, Valerie's husband of four months. Defendant and Erin had a strained relationship, and Erin did not approve of defendant and Valerie's recent marriage. On March 3, 2004, defendant and Erin were in the apartment together while Valerie was working at her second job at a nearby gas station. Defendant offered to give Erin a massage, commenting on how she must be sore after track practice. Erin accepted his offer, but protested when defendant made sexual advances during the mas-

sage. Erin ultimately accused defendant of forcing her to have intercourse. She reported that defendant put his mouth on her breast, penetrated her vagina, and began kissing her and placing his tongue in her mouth. The sexual assault ceased when defendant heard a noise which he believed was the garage door opening.

After the assault, Erin left the apartment with her dog and ran barefoot to the apartment of a neighbor, Ladarius Bankhead, who was a high school friend. Erin told Ladarius that defendant sexually assaulted her, and Ladarius' mother, Lawanda Bankhead, contacted the police. Erin gave an oral statement to a police officer at the Bankhead apartment. She also spoke to her mother and told her that defendant sexually assaulted her.

Erin was taken to the hospital for an examination and evidence was collected. Specifically, swabs were taken of Erin's left breast and right cheek for DNA testing, pursuant to Erin's report that defendant had placed his tongue on those areas. After the medical examination, Erin went to the police station to give a handwritten statement detailing the assault. Defendant was arrested for the sexual assault, but was released pending the outcome of DNA tests.

On March 5, 2004, defendant and Valerie purchased a town house in Aurora, as was their plan prior to Erin's allegations against defendant. Defendant was not permitted to move into the town house and was not given a key. He was permitted to stay at the town house during the day when Erin was at school. Valerie would leave a key for defendant and would collect it from him at the end of the day. Erin had no knowledge of this arrangement.

Although defendant was not allowed to live in the home, Valerie saw and spoke to defendant frequently. She confronted defendant about Erin's allegations and he admitted that he ran a bath for Erin and massaged her legs, but denied touching her in any other way.

Defendant indicated that Erin was angry at him because they argued over her cellular telephone usage. Defendant maintained that he did nothing wrong and assured Valerie that the DNA testing would vindicate him. He repeatedly asked Valerie to go to the police and tell them that Erin was lying and changing her story, even though Erin had remained consistent. Valerie declined, reasoning that the DNA evidence would speak for itself. Sometime after Erin's death, DNA testing revealed that traces of amylase, a substance found in saliva, were present on swabs of Erin's left breast and right cheek. DNA was extracted from the amylase which matched defendant's DNA profile. The amount of amylase available for testing was minimal, and the DNA expert could not say with certainty that the DNA recovered came from saliva.

On Saturday, March 27, 2004, the date of her murder, Erin was scheduled to leave town to spend spring break with her father, Edreick Justice. Valerie advised defendant that Edreick would be picking up Erin between 9 and 10 a.m. on March 27. She asked defendant to reschedule a 10:30 a.m. veterinary appointment for the family dog so that defendant would not encounter Erin when he went to retrieve the dog. The veterinary appointment was rescheduled by defendant for 12:30 p.m.

Valerie went to work early Saturday morning. At 7:48 a.m., she called defendant's cellular telephone and left a message advising him to cancel the veterinary appointment altogether, because plans had changed and Erin was not going to her father's house until later that afternoon. At 10 a.m. Valerie spoke to defendant on the telephone and gave him this information.

Valerie had called Erin several times that morning, but was unable to reach her. Sometime after 10 a.m., Valerie left work and went to the town house to check on Erin. When she arrived at her home, Valerie found that the front door was ajar. She heard the dogs barking and

could tell they were in the downstairs laundry room. She observed stains on the carpet and the wall leading up the staircase, which she later realized were bloodstains. She went upstairs to look for Erin, and found her, dead, in the bathroom. Erin's naked body was lying in the bathtub, which was filled with bloody water. Valerie ran, screaming, out of the home and called 911.

At about the same time, Valerie's neighbor, Kayleen Steele, was also calling 911. Steele's town house was connected to the Justice unit by a common wall. Earlier that morning, between 8 and 8:40 a.m., Steele heard "scuffling and bumping sounds," a female voice that sounded distressed, and whimpering noises coming from the Justice home. She also heard "a mature male voice saying, 'so help me God'" and a "young, female voice saying, 'I'll just leave then. Let me go. I'll leave,'" followed by a "thump" coming from upstairs. Sometime after 10:30 a.m., Steele heard a scream of "sheer terror," which prompted her to call 911.

Valerie was taken by ambulance to the hospital. Valerie's sister contacted defendant to tell him that Erin was dead and Valerie was hospitalized. Defendant seemed undaunted by the news, but indicated that he would go to the hospital to be with Valerie. Aurora police waited for defendant at the hospital after he assured them that he was headed there, but defendant never came. An Aurora police officer called defendant on the telephone, but defendant declined to speak to the officer on advice of counsel. Defendant did agree to meet with police the day after the murder, with counsel present. During that meeting, defendant admitted that he went to the town house at approximately 7 a.m. on the day of the murder, but denied seeing or speaking to Erin. Defendant could not account for his whereabouts after leaving the town house, other than to say he went to get coffee at a location he could not recall, and then drove around or sat in

his parked car in locations he also could not recall. Defendant could not explain why he went to the house at 7 a.m. when he knew the veterinary appointment was not until 12:30 p.m. Defendant never went to the 12:30 p.m. appointment and did not call to cancel.

Michael Dabney, a crime scene technician, indicated that he did not find any evidence of forced entry into the town house. He did observe a significant amount of blood in the first-floor kitchen area. There were bloodstains on the kitchen floor, table, counter tops, and kitchen cabinets. Dabney also observed wipe marks on the kitchen floor and the kitchen sink. There was a rag on the stovetop that was stained with blood. There was also a red frying pan on the kitchen counter that was stained with blood. There were two knife blocks on the kitchen counter near the frying pan. Both blocks were knocked over and some of the slots for holding knives were empty.

Dabney saw reddish-brown staining, which he believed to be blood, on the stairs, the landing, the door of Erin's bedroom, and in the hallway leading to the bathroom on the second floor of the town house. Erin's body was observed in the bathtub of the upstairs bathroom, submerged up to the head in bloody water. Dabney explained that there was a large amount of blood in the bathroom, and stated that the blood was "[e]verywhere *** except on the ceiling." A chemical called leuco crystal violet (LCV) was applied to several bathroom surfaces in an attempt to discover latent print evidence. The LCV test enhanced ridge impressions on a ceramic tile located just inside the bathroom entryway, and also revealed smears on the bathroom doorknob assembly that appeared to have a pattern on them. LCV is considered a presumptive test for the presence of blood and turns purple when in contact with blood. The LCV turned purple when applied to the tile and the doorknob assembly.

The ridge impressions on the bathroom tile were later identified by LeRoy Keith, a latent print examiner, as a portion of defendant's bare footprint. Although there was evidence that defendant had been in the bathroom prior to the day of the murder to fix the showerhead, Keith testified that the footprint could not have been a preexisting print left on the floor. Keith classified the footprint as a "positive print" that was made when blood was transferred from the foot onto the tile; it did not appear after blood washed over a preexisting print.

The tile was tested by a second expert, Tamara Camp, for the purposes of obtaining DNA evidence. Camp swabbed three areas of the tile and conducted a Tetramethylbenzadine (TMB) test on two of the swabs. Like the LCV test, the TMB test is a presumptive test for the presence of blood. One of the swabs, taken from the area of the tile adjacent to the footprint, tested negative for the presence of blood. However, DNA was extracted from the swab that was consistent with Erin's DNA profile. Camp testified at trial that the DNA extracted from this swab came from "apparent blood" and that the substance swabbed was part of one bloody stain that included the footprint. Camp admitted that the TMB test was negative for the presence of blood, but opined that the result was a false negative.

Additionally, the pattern impressions on the doorknob assembly were found to be similar to a pattern found on gloves belonging to defendant issued through his employment as a painter for Caterpillar. The LCV test was presumptively positive for the presence of blood on the doorknob assembly, and DNA testing revealed that Erin's DNA was found on the doorknob assembly.

Other evidence was recovered. The red frying pan left on the kitchen counter tested positive for the presence of Erin's blood. Small pieces of black plastic recovered from the kitchen light cover, the living room,

and the bathroom were determined to have come from the hilt portion of kitchen knives with black handles, similar to knives found in the town house. Defendant's palm print was found on a roll of plastic garbage bags found under the kitchen sink. Valerie testified that she was not aware of a time when defendant took out the garbage or changed the garbage bag, but she could not say with certainty that defendant never did these chores because defendant had access to the town house when she was not present. Erin's Edward Hospital discharge papers, issued after the sexual assault examination, were found in the glove compartment of defendant's van. Valerie averred that she never gave those papers to defendant.

Valerie testified that she kept a limited supply of over-the-counter drugs in the household. Valerie believed there was some cough medicine and a blister-pack of cold medicine in the house at the time Erin was murdered.

The postmortem examination revealed bruising on Erin's head, consistent with Erin being beaten with a frying pan, such as the red frying pan found at the crime scene. The examination also revealed deep cuts, which severed muscle and arteries and went almost to the bone on Erin's neck and wrists. The cuts could have been made by kitchen knives, such as those found in the town house. Toxicology testing indicated that Erin consumed lethal doses of over-the-counter medications prior to her death. There was evidence of blood aspirated in her lungs and bloody water in her stomach. It was opined that Erin died as a result of being beaten, poisoned, cut, and drowned. The final cause of death was drowning.

Defendant presented the testimony of an Aurora police officer who testified that she obtained defendant's key ring on March 29, 2004, and went to the town house to test the keys. None of defendant's keys opened any door to the home.

Erin's father, Edreick, testified that Erin once told her stepsister that she had been gang raped by members of the Gangster Disciples street gang. Edreick spoke to Erin about the alleged gang rape, but she was evasive and Edreick never got an answer as to whether it actually happened. Edreick later learned from Valerie that Erin was not raped by gang members.

Defendant's sister and her fiance testified to defendant's reputation as a law-abiding, nonviolent person.

The jury found defendant guilty of first degree murder and also found that the murder was accompanied by exceptionally brutal or heinous conduct indicative of wanton cruelty. The matter proceeded to the death-eligibility portion of the sentencing phase. Defendant was found death-eligible on two grounds: that he killed the victim to prevent her from pursuing rape charges against him (720 ILCS 5/9—1(b)(8) (West 2004)) and that the murder was committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, or design (720 ILCS 5/9—1(b)(11) (West 2004)). After hearing evidence in aggravation and mitigation, the jury sentenced defendant to death.

Defendant appealed directly to this court. 134 Ill. 2d R. 603. He now asserts that the trial court made numerous errors that require reversal of his conviction and sentence. Defendant maintains that the trial court erred during the guilt phase of trial by denying his request for a continuance, and then denying his request to reopen proofs to refute surprise testimony offered by a State's expert; accepting a witness with insufficient qualifications as an expert in the field of fabric and pattern impressions; denying defendant's motion to suppress a videotaped interview with police; applying the wrong standard of review when considering the State's forfeiture-by-wrongdoing argument; admitting other-crimes evidence; allowing the medical examiner to testify to the results of toxicology testing he did not perform;

refusing defendant's request for a separate hearing to determine the presence of a sentence-enhancing factor; denying defendant's request for a special jury instruction related to the sentence-enhancing factor; and denying defendant's motion for a mistrial based on the fact that he was wearing a Department of Corrections wristband during a portion of the jury selection. Defendant further asserts that he is entitled to a new sentencing hearing because toxicology evidence, improperly admitted during the guilt phase, prejudiced the jury's eligibility finding; the State committed error when it made a religious reference during argument; and the court erred when it allowed the jury to hear an audiotape of a telephone message left by the victim for her mother. Additionally, defendant contends that the Illinois death penalty is unconstitutional for several reasons.

We address these claims in turn.

## ANALYSIS

### Trial Errors

#### *Testimony of State's DNA Expert*

Defendant first asserts that the trial court erred in denying his request for a continuance to obtain an expert to refute certain testimony of the State's DNA expert, Tamara Camp, which was not disclosed to the defense prior to trial. Defendant also asserts that the trial court compounded this error when it refused to allow defendant to reopen his case to present expert testimony on this issue after defendant obtained an expert without the benefit of a continuance. Embedded in these claims is defendant's contention that the State committed a discovery violation at trial which should have been acknowledged and appropriately sanctioned by the trial court. Defendant maintains that these errors amounted to a violation of his constitutional right to due process of law, the right to present a defense, the right to compul-

sory process, and his right to effective assistance of counsel.

The State responds that the trial court's rejection of defendant's discovery-violation argument and its denial of defendant's motion for a continuance and motion to reopen his case were entirely proper because defendant was aware of the evidence in question prior to trial and failed to diligently seek an expert to rebut it. Additionally, the State argues that the evidence that would have been elicited from defendant's expert was properly excluded because it was not material.

Before addressing the merits of defendant's claim, we consider the circumstances surrounding Camp's testimony.

Camp is a forensic scientist employed by the Du Page County Crime Laboratory, specializing in forensic biology and DNA. Prior to trial, Camp generated a report that was tendered to the defense in discovery. The report indicated that three swabs, labeled 10B1, 10B2, and 10B3,[1] were taken from a piece of ceramic tile. The piece of tile was removed from the bathroom where Erin's body was found, specifically, the area of the bathroom floor just inside the doorway. At trial, Camp explained that an area in the center of the tile contained a very clear ridge impression that was suitable for latent print analysis. That ridge impression was positively identified as defendant's footprint. Directly adjacent to the area containing defendant's footprint was another ridge impression. The second ridge impression was of a lesser visual quality and was less suitable for latent print

[1]Swab 10B2 was a swab taken from the center area of the tile. It was never tested. Swab 10B3 was taken from the area of the tile that was covered by the doorway threshold. The swabbed portion tested positive for the presence of blood. DNA testing revealed a mixture of DNA profiles on the swab. One profile matched Erin's DNA; the other was from an unknown contributor.

comparison. However, that area of the tile had turned an "intense" purple color after being treated with LCV. Swab 10B1 was taken from the intensely purple portion of the tile containing the blurred ridge impression. Camp explained that she swabbed this portion of the tile because the intense purple reaction indicated that more body fluid was located in that area. Also, she wanted to preserve the area of the tile that contained the clear ridge impression for further analysis.

Camp's report stated that a "limited portion" of swab 10B1 was "negative to a presumptive test for the presence of blood." However, DNA was extracted from that swab and was consistent with having originated from Erin. Camp did not offer any opinion as to why a portion of the swab was negative for the presence of blood in her report.

During her trial testimony, Camp explained that she engages in a multistep process when conducting DNA analysis. First, before beginning DNA analysis, Camp tests a stain to determine whether it is "possible blood or semen or saliva or some other body fluid." If a body fluid is detected, the next step is to extract DNA from the body fluid and quantify the amount of DNA that has been extracted. The final step would include a genetic analysis to determine a DNA profile. Within that context, Camp discussed the process she used to evaluate swab 10B1.

As stated, swab 10B1 was taken from a portion of tile that contained a blurred ridge impression and was intensely purple in color from having reacted with LCV. The reaction from the LCV test indicated that the area of the tile swabbed was presumptively positive for the presence of blood. Despite the positive LCV test, Camp tested the swab with TMB, a more sensitive and more reliable presumptive test for the presence of blood, as her protocol dictates. The TMB test was negative,

indicating that the substance swabbed was not blood. Camp was directly asked by the State why the test was negative. Camp explained, "both tests have the same chemical reaction. I would expect that perhaps the leuco crystal violet [LCV] catalyzed all of the hem[oglobin] and therefore there was none left which would be able to react to the TMB test." Camp opined that the substance she swabbed and tested for DNA was "apparent blood which is consistent with having originated from Erin Justice." Camp explained that the words "apparent blood" are used because there is no test available to her that can actually confirm that a substance is blood.

Camp was then asked, "With respect to the area that LeRoy Keith [expert in latent print identification] used to make his analysis of that ridge detail [footprint on the tile], have you formulated a conclusion?" Camp responded that she did not understand the question. The prosecutor then asked, "To a reasonable degree of forensic biology, that area that is observed on the tile, what is your conclusion regarding that?" Camp replied, "Well, it is all one stain." The State then asked, "So, the areas where Mr. Keith indicated to you that he used the ridge details to make identification [of defendant's footprint], do you have an opinion as to what that substance is?" Camp stated, "Again, it's apparent blood which is consistent with having originated from Erin Justice."

In sum, despite the negative TMB test, Camp testified that the substance on swab 10BI was "apparent blood." She further testified that the substance swabbed was part of "one stain" which also contained defendant's footprint. Accordingly, the conclusion to be drawn from Camp's testimony was that defendant's footprint was made with Erin's blood.

Despite the negative TMB test, Camp opined that the substance on the portion of the tile containing defen-

dant's footprint was blood because the tile tested positive when treated with LCV. Camp explained, "From the first day that I analyzed the tile it was apparent that there was blood on the tile. And after my DNA analysis I concluded that the apparent blood was consistent with having originated from Erin Justice." She acknowledged that the TMB test did generate a positive result on another area of the tile that was previously tested with LCV, which seemed contrary to her opinion that the LCV absorbs all the hemoglobin in the blood, thus causing the TMB test to be negative.

The defense began its cross-examination of Camp by asking if she included her opinion that the negative TMB finding could still indicate blood in any of the reports she generated in this case. Camp replied that she had not done so. The defense then asked, "You arrived at that opinion after talking to the prosecution in recent days, did you not?" Camp replied, "Well, not necessarily, no." The State objected and a sidebar was held where the State asserted that defense counsel was "well aware ***" that the results in this examination in total is going to be that this Defendant's footprint was in Erin Justice's blood. We filed numerous documents on that." The State did not have those filings in its immediate possession, but nevertheless asked the trial court to take judicial notice that the information in question had been disclosed. The State also requested that the jury be apprised of the contents of the filings containing the disclosure. The court overruled the objection and cross-examination resumed.

Prior to redirect examination, the State reasserted that it previously disclosed Camp's opinion that the substance on the tile was blood. The trial court asked the State to find the relevant document, and a recess was taken. After the recess, the State advised the trial court that it could not find the report where Camp disclosed

the information at issue. The State did provide a memorandum of law, attached to its "Motion to Declare Forfeiture by Wrongdoing," where the State represented that defendant's footprint was found on a bathroom tile in the victim's blood. However, the State's support for that position was a two-page report authored by LeRoy Keith, the latent print expert.

In response, defense counsel orally moved to strike the contested testimony and requested that the State's notice to seek the death penalty be stricken on the basis that the State committed a discovery violation. The trial court denied defendant's motions.

On the following day, defendant renewed his motion to strike portions of Camp's testimony and the State's notice to seek the death penalty on discovery violation grounds. The trial court denied these motions, stating:

"As I see it, it all comes down to the defendant's position that they were unaware of the fact that she would be able to testify or opine that the area where there was a negative presumptive test for blood still was in her opinion blood based on everything else. But in looking at her report there were three swabs all from the same piece of ceramic tile. The first one *** was negative to a presumptive test for the presence of blood, portion extracted for DNA. And then there's a second one and a third again a swab from a piece of ceramic tile blood indicated portion extracted for DNA. She testified a number of times that in her opinion it was one stain. And she reiterated that, and the fact that she had a negative presumptive test for blood in one portion, it's reasonable to me that she be allowed to explain why it was negative. And she did that she explained it in her opinion it was negative because of the reaction of the LCV basically used up everything that was there to react when she did her own test. But I don't find that the defense is surprised. They were on notice of the fact that it was identified as a bloody footprint through various experts. Although she was not identified by name, she ought to be able to explain why in her opinion the test was negative."

The trial proceeded, but prior to resting his case, defendant requested a continuance so he could confer with an expert regarding Camp's testimony, particularly the portion describing the interaction of the LCV and TMB tests. The trial court denied the request, reiterating its previous finding that the State did not commit a discovery violation because defendant had sufficient knowledge of what Camp's testimony would be.

Notably, defendant requested this continuance on Thursday afternoon at 4:53 p.m. The trial court followed a schedule in this case whereby the matter would proceed from Tuesday morning until Friday evening, with Monday off, every week until completion. The proceedings generally concluded at 5 p.m. daily. Defendant requested a continuance on Thursday afternoon until Tuesday morning, which would have amounted to a one-day delay.

On Monday, the matter was placed on call and a hearing was held outside the presence of the jury regarding defendant's motion to reopen proofs and present expert testimony. In that motion, defendant stated that Dr. Karl Reich, who holds a degree in molecular biology from the University of California, Los Angeles and Harvard University, was prepared to testify that the TMB test used by Camp is the most sensitive presumptive blood test available; that a negative TMB test strongly suggests that there is no blood in the area tested; and that Camp's testimony that the LCV consumed the reactive blood components, thus confounding the TMB test, was incorrect. The trial court denied the motion, finding once again that no discovery violation occurred and that Camp's testimony was no surprise to the defense.

In light of these facts, we consider defendant's claim that the trial court erred by failing to grant his request for a continuance or his motion to reopen proofs. Defendant bases these claims on the underlying assertion that the State committed a discovery violation when

it failed to disclose Camp's conclusion that the TMB test produced a false negative. The State maintains that it did not commit a discovery violation because it was not required to disclose Camp's expert opinion. Further, the State asserts that defendant was not surprised by Camp's testimony because defendant knew that the State intended to prove that defendant's bare foot transferred Erin's blood onto the tile and left a footprint.

The parties do not dispute the facts giving rise to the alleged discovery violation. Both sides agree that Camp did not include her finding that the TMB test produced a false negative, and did not state her reason for the negative TMB test in her report. Since the issue before us is one of law, we review it *de novo*. *People v. Hood*, 213 Ill. 2d 244, 256 (2004).

Disclosure requirements in criminal cases are governed by Supreme Court Rule 412, which provides, in relevant part, that the State shall disclose to defense counsel certain material in its possession or control, including "any reports or statements of experts, made in connection with the particular case, including the results of physical or mental examinations and of scientific tests, experiments, or comparisons, and a statement of qualifications of the expert." 188 Ill. 2d R. 412(a)(iv). Discovery rules are intended to protect the accused against surprise, unfairness, and inadequate preparation. *People v. Heard*, 187 Ill. 2d 36, 63 (1999). As the committee comments to Rule 412(a)(iv) explain:

> "[W]ithout the opportunity to examine such evidence prior to trial defense counsel has the very difficult task of rebutting evidence of which he is unaware. In the interest of fairness paragraph (a), subparagraph (iv), requires the disclosure of all such results and reports, whether the result or report is 'positive,' or 'negative,' and whether or not the State intends to use the report at trial. If the State has the opportunity to view the results of any such examination, the same opportunity should enure to defense

counsel. No relevancy limitation is included; the only requirement is that the examination, etc., have been made 'in connection with' the case." 134 Ill. 2d R. 412(a)(iv), Committee Comments, at 347-48.

In this case, Camp authored a report which stated that "a limited portion [of the swab of the tile directly adjacent to defendant's footprint] was negative to a presumptive test for the presence of blood." She did not state that the "negative" result was a false negative and did not include her conclusion that the DNA extracted from that swab came from blood. The State argues that Camp's conclusion was a logical inference from the information she did disclose and maintains that it complied with Rule 412 because it disclosed Camp's report as it was written. We agree with the State that it properly disclosed the report it had in its possession, and we do not suggest that the report was manipulated in any way to exclude relevant information. The fact remains that relevant information was left out of the report, and the information provided was misleading. Camp disclosed the result of a scientific test, but did not disclose the fact that she intended to disregard the result and interpret it to mean the opposite of what was reported.

We disagree with the State's assertion that the defense should have "logically inferred" that Camp would testify in this fashion. There is nothing "logical" about an expert testifying to a conclusion that stands in complete opposition to the conclusion stated in her own official report. We note that the State has never suggested that it was unaware of Camp's undisclosed conclusion about the TMB test results. The record is clear that Camp did not spontaneously offer this information during her testimony. Her conclusion was elicited from the State through a direct question. Further, when the discovery violation was alleged at trial, the State at-

tempted to show that it had disclosed Camp's conclusion, but was unable to do so.

The State argues that under Rule 412, it is not required to reduce every conversation it has with a witness to writing, and emphasizes that Rule 412(a)(iv) only requires disclosure of written reports, not expert opinions. While both of these points are supportable, the fact remains that Rule 412, like all discovery rules, is designed to protect the accused against unfair surprise. *Hood*, 213 Ill. 2d at 258; *Heard*, 187 Ill. 2d at 63. That protection was not afforded to defendant in this case, as information integral to the defense was not divulged prior to trial. This omission unfairly burdened defense counsel with the "difficult task of rebutting evidence of which he [wa]s unaware" (134 Ill. 2d R. 412(a)(iv), Committee Comments, at 347) and amounted to a violation of the disclosure rule.

It is well established that the failure to comply with discovery rules does not require a new trial in every instance. *Heard*, 187 Ill. 2d at 63; *People v. Cisewski*, 118 Ill. 2d 163, 172 (1987). A new trial should only be granted if defendant, who bears the burden of proof, demonstrates that he was prejudiced by the discovery violation and the trial court failed to eliminate the prejudice. *Cisewski*, 118 Ill. 2d at 172; *People v. Robinson*, 157 Ill. 2d 68, 78 (1993). Several factors are considered when determining whether a new trial is warranted, including the closeness of the evidence, the strength of the undisclosed evidence, and the likelihood that prior notice would have helped the defense discredit the evidence. *Cisewski*, 118 Ill. 2d at 172. We also consider the remedies sought by defendant, such as whether defendant requested a continuance, when determining if actual surprise or prejudice existed. *Heard*, 187 Ill. 2d at 63; *Robinson*, 157 Ill. 2d at 78.

We conclude that defendant was prejudiced by the State's discovery violation, and that the trial court failed

to eliminate the prejudice. The State presented significant circumstantial evidence of defendant's guilt, but the lynchpin of the State's case was the evidence of defendant's bare footprint, allegedly made with Erin's blood, on a tile in the bathroom where Erin's body was found. Camp's testimony that the substance swabbed was "apparent blood" despite the negative TMB test was devastating to defendant. This testimony deprived defendant of the argument that Camp's test results contradicted the test results of the State's other expert, LeRoy Keith, who concluded that the ridge impressions positively identified as defendant's footprint were made on the tile with Erin's blood. If the swab taken in the area directly adjacent to the footprint, which also contained ridge impressions, was negative for the presence of blood, defendant could argue that the ridge impressions identified as his footprint were likewise not made in blood. Camp's statement that the substance swabbed was negative to a presumptive test for the presence of blood provided some support for defendant's argument that the footprint found on the tile was a preexisting print that came in contact with a substance, other than blood, that contained Erin's DNA, such as skin cells or saliva. This argument would have had a basis in the evidence, as Valerie testified that defendant was previously in the bathroom when he changed the showerhead at her request.

Further, if defendant were made aware of Camp's conclusion that the TMB test produced a false negative because the LCV used all the hemoglobin in the blood, he could have called an expert to refute this contention during his case in chief, or could have chosen to pursue a different line of defense altogether. Defendant was prejudiced when Camp's conclusions were revealed for the first time at trial.

We recognize that defendant was aware that Camp would be called as a State witness long before trial com-

menced, and there is no indication that the defense attempted to interview Camp prior to trial. In *Hood*, the defendant alleged that the State presented surprise expert testimony which amounted to a discovery violation. The State disclosed the expert, but did not disclose a certain aspect of the expert's testimony. The defendant never attempted to interview the State's witness prior to trial and did not speak with the witness after trial commenced, even though the trial judge encouraged the defendant to do so and took time out of the trial to facilitate the interview. Also, the defendant did not ask for a continuance to obtain an expert to counter the testimony, but only requested that the testimony be stricken. *Hood*, 213 Ill. 2d at 262. This court found that the defendant waived his discovery-violation argument because he elected to forgo reasonable methods available to alleviate the purported prejudice. *Hood*, 213 Ill. 2d at 262-63. Similarly, in *People v. Shinohara*, 375 Ill. App. 3d 85, 109 (2007), the appellate court concluded that the State committed a discovery violation when it failed to disclose the report of an expert witness, but declined to reverse the defendant's conviction because he knew about the expert and had the opportunity to speak to the expert before trial, but failed to do so. Additionally, the defendant did not seek additional time to prepare or seek a continuance to secure his own expert. *Shinohara*, 375 Ill. App. 3d at 109.

In this case, defendant sought a continuance to find an expert to refute Camp's surprise testimony. Even when that request was denied, defendant obtained an expert for the next court date and sought to reopen his case to include the expert's testimony. Unlike the defendants in *Hood* and *Shinohara*, defendant here made reasonable efforts to alleviate the prejudice created by the State's discovery violation, and his attempts were

wrongfully thwarted by the trial court. Recently, in *People v. Walker*, 232 Ill. 2d 113, 125-26 (2009), we discussed factors a trial court should consider when entertaining a request for a continuance, including the movant's diligence, the defendant's right to a speedy, fair and impartial trial, the interests of justice, the history of the case, the complexity of the matter, the seriousness of the charges, docket management, judicial economy, and inconvenience to the parties and witnesses. We recognize that the trial court did not find that the State's conduct rose to the level of a discovery violation and, therefore, did not consider whether a continuance should be granted or proofs reopened, in that context. However, we feel compelled to note that there is no good reason why the trial court denied defendant's request for a continuance after Camp's testimony in light of the seriousness of the charge, the complexity of the evidence at issue, and the fact that a short continuance would not have created any hardship to the court, the parties, or the witnesses in this case.

For the reasons discussed, we reverse defendant's conviction and death sentence and remand the matter for a new trial. We note that there is no double jeopardy impediment to retrial in this case. Defendant does not assert that the evidence against him was deficient, and our review of the evidence demonstrates that it was sufficient to prove defendant guilty beyond a reasonable doubt. *People v. Lopez*, 229 Ill. 2d 322, 366-67 (2008); *People v. Wheeler*, 226 Ill. 2d 92, 134-35 (2007). We make clear, however, that our analysis regarding the sufficiency of the evidence is not binding on retrial. *People v. Roberts*, 214 Ill. 2d 106, 126 (2005); *People v. Fornear*, 176 Ill. 2d 523, 535 (1997). Because a new trial is required, we may address additional claims of error that are likely to arise again on remand. *People v. Hari*, 218 Ill. 2d 275, 299 (2006); *People v. Fuller*, 205 Ill. 2d 308, 346 (2002).

### Qualifications of Expert Witness

Defendant asserts that the trial court erred by accepting LeRoy Keith as an expert witness on fabric pattern impressions because he lacked sufficient training to qualify as an expert. The State counters that Keith was trained to make fabric impression comparisons, that his knowledge in this area is not common to laypersons, and that his testimony assisted the jury in reaching its conclusion.

At trial, Keith explained that he is a forensic scientist and assistant crime lab director at the Du Page County Crime Laboratory, where he has been employed since 1999. Prior to offering this testimony, Keith stated that he had forensic scientist training with the United States Army between 1993 and 1995, which included two weeks of training devoted to fabric pattern impression analysis. He stated that, since completing his Army training, he has attended numerous classes, seminars, and training programs related to development and processing techniques and comparison processes of fingerprints and footprints, and that he has been certified as a latent print examiner. There are no certifications for expertise on fabric pattern impression analysis. Keith admitted that he had never been certified in court as an expert in that field. Defendant objected to Keith's qualifications as a fabric pattern impression expert. The objection was overruled, and Keith was qualified as an expert in both latent print and fabric pattern impression identification.

Keith testified that he examined fabric pattern impressions that were left on the bathroom doorknob assembly. Keith stated that he believed the impressions on the doorknob assembly were positive impressions, such that a substance, in this case blood, was on the fabric and was transferred to the doorknob assembly. Keith mixed hand lotion and food dye to create a substance with the consistency of blood, and then used this mixture to make test impressions with gloves recovered from

defendant's work locker. Keith visually compared the impressions on the doorknob assembly to his test impressions, and concluded that the impressions were similar in size and shape. Keith determined that the impression on the doorknob assembly could have been made by the type of gloves recovered from defendant's locker.

The decision to qualify a witness as an expert rests within the sound discretion of the trial court. *People v. Novak*, 163 Ill. 2d 93, 104 (1994). We will find an abuse of discretion only where the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). A person can be permitted to testify as an expert if that person's experience and qualifications afford him or her knowledge that is not common to the average layperson and will assist the jury in evaluating the evidence and reaching a conclusion. *People v. Mertz*, 218 Ill. 2d 1, 72 (2005). There are no precise requirements regarding experience, education, scientific study, or training. *Mertz*, 218 Ill. 2d at 72.

We conclude that the trial court did not abuse its discretion in accepting Keith as an expert in the field of fabric pattern impressions. We recognize that Keith participated in only two weeks of training in this area of analysis some 10 years prior to trial and that he had not been qualified as an expert in this field prior to the instant trial. However, it was not unreasonable to conclude that Keith was an expert in this area in light of his extensive experience in comparing other, analogous types of impressions, such as latent prints. Further, Keith possesses knowledge of the process by which impressions are left on objects. Keith's knowledge in this area is not common to the average layperson and provided assistance to the jury in evaluating the evidence before it. See *People v. Columbo*, 118 Ill. App. 3d 882, 961 (1983) (trial court

did not err in recognizing witness as expert in the field of hand-print measurements where expert had never testified at a criminal trial before, was never declared an expert, and had not done any hand measurements for several years). Accordingly, we reject this claim of error.

### Motion to Suppress

Defendant next asserts that the trial court erred in denying his motion to suppress statements he made in a videotaped interview as the tainted fruit of an illegal detention. In the alternative, defendant asserts that the videotape should not have been shown to the jury because he was denied the effective assistance of counsel during the interview. The State counters that defendant's statements cannot be characterized as the "fruit" of his detention because they were made in an interview that was entirely separate from the detention and were in no way the product of the detention. Additionally, the State maintains that defendant's ineffective assistance claim lacks merit. However, even if counsel were found to be deficient, that fact alone would not preclude the admission of defendant's statements into evidence. Before addressing the merits of this claim, we review the facts surrounding defendant's videotaped interview.

The State's evidence at the hearing on the motion to suppress established that defendant's attorney, Justin Sather, whom defendant retained to represent him in matters related to Erin's sexual assault accusation, arranged for defendant to meet with detectives from the Aurora police department at a restaurant on Sunday, March 28, 2004, at noon. Sather scheduled the meeting at defendant's request. Defendant was considered a "person of interest" in the murder, and the Aurora police department issued a broadcast to other police departments requesting that they notify Aurora if they saw defendant. Defendant's name, date of birth, license plate number, and a description of his van were included in this broadcast.

At 12:06 p.m., two Naperville police officers spotted defendant in the drive-through lane of a Naperville bank. The officers saw defendant get out of his van and approach another vehicle, which they later learned was driven by defendant's ex-wife. The officers contacted dispatch and waited for direction from the Aurora police. The officers believed that defendant saw them and were concerned that a safety issue might arise, so they decided to approach defendant sometime between 12:10 and 12:15 p.m. The officers asked defendant if they could talk to him and pat him down, and he agreed. While they were conversing with defendant, the officers were advised by the Aurora police to secure defendant's van. The officers turned off the van and retained possession of defendant's keys. They did not allow defendant to enter the van to obtain his cellular telephone, but they did get the telephone and give it to defendant. Defendant used the telephone to call his attorney.

At 12:25 p.m., Sather arrived and was permitted to speak to defendant. The Aurora police arrived shortly thereafter, around 12:30 p.m. Detective Trujillo of the Aurora police department testified that he spoke to defendant and his attorney and suggested that they go to the police station to talk, rather than the restaurant as originally planned, because it would be more private. Defendant wanted to go to a public place, such as the library, but agreed to go to the police station. Defendant drove to the police station in his van.

At the police station, defendant was given time to confer with counsel before he was interviewed by detectives. At the interview, which was videotaped, defendant was advised of his *Miranda* rights. Defendant affirmed that he was voluntarily at the police station and knew that he was free to leave at any time. Defendant's counsel was present for the entire interview.

During the interview, police questioned defendant about his whereabouts at the time of the murder. As stated previously, defendant admitted that he went to Erin's house at 7 a.m. to pick up one of the family's dogs for a 10 a.m. veterinary appointment, and admitted that he knew Valerie was at work and Erin would be the only person at home. When confronted, defendant also admitted that the appointment was not scheduled for 10 a.m. because he rescheduled it for 12:30 p.m. Defendant explained that no one answered the door, so he left. After leaving the house, he bought coffee, which he drank in his van. He could not recall where he purchased the coffee, but thought it might have been at a convenience store. After purchasing the coffee, defendant stated, he drove around or sat in his van because he had nowhere else to go. He could not recall where he drove or where he parked his van, but stated that it was near his ex-wife's house. During the course of the interview, counsel asked clarifying questions regarding defendant's whereabouts, repeatedly advising defendant that specificity was very important. The detectives questioning defendant advised him that his inability to recall events that occurred less than 24 hours before was suspicious and stated that they disbelieved his story.

Sather testified that defendant contacted him the previous day and told him that the Aurora police wanted to speak to him because Erin was dead. Either defendant or a family member told Sather that Erin had committed suicide, and when Sather contacted the State's Attorney's office to arrange for an interview, he still believed that Erin had committed suicide.

On Sunday, just prior to the scheduled interview, defendant called Sather and told him the police had stopped him while he was at the bank. Sather went to the bank and asked defendant what was going on. Defendant stated it was nothing, leaving Sather to believe that police were still investigating a suicide.

Sather added that defendant never objected to going to the police station or to being interviewed by the police. In fact, Sather advised defendant not to speak to the police and defendant disregarded his advice. Sather stopped the interview when police indicated that a neighbor heard defendant in the house prior to Erin's death.

Defendant testified that he agreed to speak to the police at a restaurant on March 28, 2004, but changed his mind before the meeting. He also stated that he never agreed to accompany the police to the station for an interview, but only went to the station because he did not believe he had a choice after police detained him at the bank. Defendant stated that he did know he could refuse to speak to the police, and his attorney never gave him that information.

The trial court denied defendant's motion to suppress. The trial court found that defendant was lawfully detained by the Naperville police. The court also concluded that defendant's continued interaction with the police was consensual, and that Sather's representation of defendant was not deficient.

This court has recently explained that, when reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996). *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Under this standard, we give great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *People v. Cosby*, 231 Ill. 2d 262, 271 (2008), quoting *Luedemann*, 222 Ill. 2d at 542. "A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief

should be granted." *Luedemann*, 222 Ill. 2d at 542. We review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted. *Cosby*, 231 Ill. 2d at 271, quoting *Luedemann*, 222 Ill. 2d at 542.

Defendant contends that his statements to police should have been suppressed because they were the product of an illegal detention. A determination that defendant was illegally detained will not necessarily resolve the issue of whether his statements were admissible. *People v. Foskey*, 136 Ill. 2d 66, 85 (1990). The relevant inquiry is whether the statements bear a sufficiently close relationship to the underlying illegality. *New York v. Harris*, 495 U.S. 14, 19, 109 L. Ed. 2d 13, 21, 110 S. Ct. 1640, 1643 (1990). Generally, courts resolve this question by considering whether the evidence was obtained "by means sufficiently distinguishable to be purged of the primary taint" of illegality. *Wong Sun v. United States*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417 (1963). However, this attenuation analysis is only appropriate where the evidence sought to be suppressed was actually obtained as a result of some illegal government activity. *Harris*, 495 U.S. at 19, 109 L. Ed. 2d at 21, 110 S. Ct. at 1643; *People v. McCauley*, 163 Ill. 2d 414, 448 (1994) ("[w]hen police conduct results in a violation of constitutional rights, evidence obtained as a result of that violation, and only evidence so obtained, is to be suppressed"); *People v. Gervasi*, 89 Ill. 2d 522, 528 (1982) ("[t]he basic assumption underlying the 'fruit of the poisonous tree' doctrine is that the challenged evidence is *derived* from some violation of a statutory or constitutional right" (emphasis in original)).

Attenuation analysis is not proper in this case because the facts readily show that defendant's statements to the police were not obtained as a result of any government illegality. The facts demonstrate that the Naperville police detained defendant in a bank parking

lot pursuant to a "person of interest" alert they received from the Aurora police department. Defendant was on his way to a prearranged interview with the Aurora police when the Naperville police executed this detention by having a conversation with defendant, patting him down and withholding his car keys. Defendant's attorney arrived at the scene of the detention, along with Aurora police officers, and, with the benefit of counsel, defendant agreed to go to the Aurora police station to speak to the police, as he previously planned to do. Defendant's car keys were returned to him, and he was free to drive away from the parking lot on his own. Defendant chose to drive himself, in his own van, to the Aurora police station. Once there, the videotape reflects that defendant was advised of his *Miranda* rights, was reminded by his attorney that he was not compelled to cooperate with the police, and expressed his willingness to submit to the interview.

Defendant's statements to police were made during an event that had almost no connection to the detention in the bank parking lot. The statements were made in a different location, to different police officers from a different jurisdiction. They were made after defendant left the scene of the detention on his own volition and drove himself, in his own van, to a prearranged meeting that was scheduled by his attorney at his request. In light of these facts, we cannot conclude that defendant's statements to the police were the product of the detention. Whether the detention was lawful has no bearing on our conclusion because the detention was in no way related to the statements at issue. Accordingly, we hold that the trial court did not err in denying defendant's motion to suppress.

We also reject defendant's contention that the trial court erred in admitting his videotaped statements because he was denied the effective assistance of counsel

when the statements were obtained. Defendant cites to *McCauley* and *People v. Rish*, 344 Ill. App. 3d 1105, 1113 (2003), for the proposition that an accused has a fifth amendment right to effective representation during a custodial interrogation. This is a well-settled proposition, but it has no application in the instant case, as defendant was not involved in a "custodial interrogation." See *People v. DeSantis*, 319 Ill. App. 3d 795, 806 (2000) (holding that "*McCauley* does not require suppression of defendant's statements as they were not given during a custodial interrogation"), *overruled on other grounds*, *People v. Johnson*, 208 Ill. 2d 118 (2003). Defendant was not taken into custody before or during the interview, and the record shows that defendant agreed to speak to the police and was explicitly told, by both the police and counsel, that he could terminate the interview and leave at any time. We find no error in the admission of defendant's videotaped statements.

*Admission of Other-Crimes Evidence*

Defendant next argues that evidence admitted at trial related to Erin's sexual assault allegation against him should have been excluded. Specifically, defendant asserts that statements made by Erin to her neighbor, her mother, a police officer, and medical personnel should not have been admitted. Defendant also argues that a handwritten statement authored by Erin should have been excluded, along with the results of DNA testing on evidence collected in relation to the sexual assault. The State responds that this evidence was properly admitted, not to prove the truth of the matter asserted, but to show that defendant had motive to murder Erin. Defendant acknowledges that statements offered to prove motive are not considered to be hearsay, and are generally admissible, but maintains that the statements offered in this case to prove motive were overly detailed and were so prejudicial that he was deprived of a fair trial.

We review the contested evidence. Lawanda Bankhead testified that on the evening of March 3, 2004, sometime after 8 p.m., Erin, whom she did not know at the time, ran up the stairs to her apartment saying, "Ladarius, Ladarius, let me in. My stepfather just raped me." Erin was wearing a T-shirt and jeans and carrying a dog. She was not wearing shoes. Bankhead testified that when Erin entered her apartment, she just sat on the kitchen floor, crying and stroking her dog. Bankhead explained that Erin acted "like we weren't even there." Bankhead stated that she called the police and while they waited for them, Erin continued to cry and did not speak.

Officer James Griffith testified that he was assigned to investigate the sexual assault against Erin on March 3, 2004. He first saw Erin at the Bankhead apartment. She was seated on the couch, clutching a pillow and crying. Erin told him that defendant drew a bath for her, and when she was finished bathing, offered to give her a massage. Erin stated she was wearing pajamas at this time; specifically, a "Junior Mint" tank top and shorts. Defendant began rubbing her legs with baby oil, and directed her to lie on her stomach. At some point, defendant put his hands up the back of her shirt. Erin stated that she told defendant to stop, and he complied. Erin turned over so she was lying on her back, and defendant resumed the massage on her legs. He tried to lift up her shirt again, and when Erin told him to stop, he got on top of her. He removed her shorts, pulled up her shirt, licked both of her breasts, kissed her neck and cheeks, and put his tongue in her mouth. Erin explained that she begged defendant to stop, cried and yelled, and tried to scratch defendant's back. At one point, defendant placed his hand over her mouth to quiet her, but removed his hand when she indicated to him that she would not scream anymore. She told defendant that she would do

"anything" if he would not have intercourse with her, and also told defendant that she "had something," hoping that he would think she was diseased and stop. Erin stated that defendant had intercourse with her which lasted 7 to 10 minutes. She explained that she just stared at the ceiling and cried because she was very afraid and thought defendant might hurt her if she struggled. Erin said the assault ceased when she heard a noise and told defendant she thought it was the garage door opening.

Valerie testified that she received a telephone call from Erin at about 9 p.m. Erin was crying and said, "Mom, something bad happened." Valerie then spoke to a police officer who advised her to come to the Bankhead apartment. When Valerie arrived at the Bankhead home, Erin was curled up on the couch, crying, shaking, and rocking back and forth. Valerie asked Erin, "What did he do to you," and Erin replied, "He stuck it in me."

Kim Santora testified that she is a registered nurse, and she was working in the pediatric emergency department at Edward Hospital when Erin arrived. Erin was upset, crying, and appeared to be scared. Erin told Santora that she was attacked at approximately 8 p.m. in her home. Erin specifically said, "He put his stuff in me." Erin confirmed that a male had put his penis in her vagina. Erin also explained that her attacker licked her left breast and her right cheek and that he kissed her and put his tongue in her mouth. She was not sure if he ejaculated. Santora obtained a rape kit and swabbed Erin's right cheek and left breast. Dr. George Koburov testified that he treated Erin in the emergency room as well. Erin behaved like a person who had been traumatized. She told Dr. Koburov that "she had been raped" and that the assailant kissed her on the breast and neck and had intercourse with her. Dr. Koburov did not detect any physical evidence of sexual assault or injury.

Erin came to the police station after completing the emergency-room examination and gave a handwritten statement. The handwritten statement was published to the jury and essentially contained the same information Erin orally provided to Officer Griffith at the Bankhead apartment.

Jean Kinnane, a forensic biologist, testified that she tested materials taken from the rape kit performed on Erin. The swabs of Erin's left breast and right cheek tested positive for the presence of amylase, a substance present in saliva. However, because the amylase levels were low on both tests, Kinnane could not conclude that the amylase actually came from saliva. Doug Saul, who was qualified as an expert in the field of forensic biology, specifically DNA testing and analysis, testified that he conducted DNA testing on the left breast swab and the right cheek swab taken after the alleged assault. The DNA on both swabs came from defendant. Saul stated that the results of the DNA test would be consistent with defendant placing his mouth on Erin's breast and cheek. However, he could not make any inferences regarding the biological tissue that placed the DNA in the area that was swabbed and, therefore, could not state with certainty that the DNA came from defendant's saliva.

It is well settled that evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crimes. *People v. Wilson*, 214 Ill. 2d 127, 135-36 (2005); *Heard*, 187 Ill. 2d at 58; *People v. Robinson*, 167 Ill. 2d 53, 62 (1995). We have held that other-crimes evidence can be admissible to show motive to commit the crime for which the defendant is being tried. *People v. Moss*, 205 Ill. 2d 139, 156 (2001); *People v. Enis*, 163 Ill. 2d 367, 388 (1994). However, such evidence should not be admitted if the prejudicial effect of the evidence substantially outweighs its probative value. *Moss*, 205 Ill. 2d at 156. The admissibility of other-crimes evidence rests within the sound

discretion of the trial court, and we will not disturb the trial court's judgment absent a clear abuse of discretion. *Wilson*, 214 Ill. 2d at 135-36.

In this case, the State presented a substantial amount of evidence regarding Erin's sexual assault allegation against defendant and made clear its theory that defendant had motive to murder Erin because he knew her allegations would be borne out by the DNA test results. The record demonstrates that the trial court weighed the probative value of the evidence against its prejudicial effect and concluded that admission of the evidence was proper, as the evidence was relevant to defendant's motive and intent. The trial court acknowledged the danger of prejudice arising out of the admission of this evidence, and recognized that it had a responsibility to limit the evidence to avoid such prejudice. The testimony that was allowed was limited. For instance, medical personnel were allowed to testify to Erin's statements that she was sexually assaulted, but were not allowed to testify that she named the perpetrator of the crime. Additionally, evidence that Erin told her friends within days of the assault that defendant had sexually assaulted her was excluded. The trial court specifically stated that the other-crimes evidence was "clearly extremely probative, and with those limits, I don't believe that the prejudice to the defendant outweighs the probative value."

In an effort to further limit any prejudice, the trial court specifically invited defense counsel to seek a limiting instruction regarding this evidence at the close of trial. The limiting instruction was sought and the jury was instructed as follows:

> "Evidence has been received that the defendant has been involved in an offense other than those charged in the indictment. This evidence has been received on the issue of the defendant's motive and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that offense and, if so, what

weight should be given to this evidence on the issue of the defendant's motive." See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000). Accordingly, we conclude that the trial court did not abuse its discretion in allowing the admission of this evidence.

Support for this conclusion is found in *People v. Moss*. There, the defendant was on trial for the murder of his former girlfriend, Renee, and her 11-year-old daughter, Diandra. The facts demonstrated that the defendant's mother and sister committed the murders at the defendant's behest while he was incarcerated awaiting trial on charges that he sexually assaulted Diandra. At the murder trial, evidence was admitted regarding the sexual assault. This evidence included testimony from Diandra's brother, who recounted statements Diandra made accusing defendant of assaulting her; the police officer who interviewed Diandra shortly after the assault; the physician who examined Diandra at the hospital; and another police officer who interviewed Diandra at the hospital. The parties agreed that this evidence was admissible to show motive for the murders, but the defendant argued, as defendant does here, that the trial court abused its discretion in admitting the evidence because its prejudicial effect substantially outweighed its probative value. We rejected that contention, holding that the trial court reasonably found that the evidence was relevant, as it supported the State's motive theory. *Moss*, 205 Ill. 2d at 157. We also noted that the trial court put limitations on the evidence to minimize its prejudicial impact and instructed the jury accordingly. *Moss*, 205 Ill. 2d at 158.

Defendant asserts that we should not apply *Moss* because it is distinguishable on the facts. Specifically, defendant points out that the victim in *Moss* was a child, whereas Erin was almost an adult. Further, the defendant in *Moss* was in jail when the murders occurred, requiring

the State to prove its case through circumstantial evidence. We see no relevant distinction. There is nothing in the *Moss* opinion to suggest that its holding is limited to cases where the victim is a child or where the evidence presented against the defendant is mostly circumstantial.

Defendant also argues that the court erred in admitting Erin's out-of-court statements because the admission of that evidence amounted to a violation of his confrontation rights as set forth in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2001). In *Crawford*, the Supreme Court held that it is a violation of the sixth amendment's confrontation clause to admit out-of-court testimonial statements of a witness unless the witness is unavailable for trial and there was a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374 ("[w]here testimonial evidence is at issue *** the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination"). Under *Crawford*, the application of the protections afforded by the sixth amendment hinges on whether the out-of-court statements sought to be admitted are "testimonial." *In re Rolandis G.*, 232 Ill. 2d 13, 25 (2008). In *People v. Stechly*, 225 Ill. 2d 246, 279 (2007), we stated that the "threshold question in confrontation clause analysis is, Are the statements at issue 'testimonial'?" See also *Rolandis G.*, 232 Ill. 2d at 27.

The analytical framework set forth in *Stechly* presumes that the out-of-court statements sought to be admitted are hearsay statements intended to prove the truth of the matter asserted, and focuses on a determination of whether those statements are testimonial in nature. *Stechly*, 225 Ill. 2d at 279. This case presents a different question that is directly answered by the *Crawford* opinion. In *Crawford*, the Supreme Court explicitly

stated that the confrontation clause does not bar the admission of testimonial statements that are admitted for purposes other than proving the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9, 158 L. Ed. 2d at 197 n.9, 124 S. Ct. at 1369 n.9. We have already concluded that Erin's statements were admitted for the purpose of proving motive; not for the truth of the matter asserted. Accordingly, Erin's statements would not be barred by *Crawford*. See *People v. Peoples*, 377 Ill. App. 3d 978, 983 (2007); *Commonwealth v. Pelletier*, 71 Mass. App. 67, 71 n.5, 879 N.E.2d 125, 129 n.5 (2008) (listing cases) ("We note that all of the Federal Circuit Courts of Appeals (except the District of Colombia Circuit, which has not dealt with the question) and the majority of State courts have indicated \*\*\* that statements, even if testimonial, when not offered for their truth do not implicate the confrontation clause"). Accordingly, we need not consider defendant's claims of error regarding the trial court's admission of Erin's statements under the doctrine of forfeiture by wrongdoing, as it is unnecessary in light of our finding that the nonhearsay evidence was properly admitted for purposes of proving motive.

### Admission of Toxicology Evidence

Defendant next asserts that the trial court erred in allowing Dr. Harkey, the medical examiner, to testify to results of toxicology testing done by someone else. Defendant asserts that, under *Crawford*, the toxicology report was an out-of-court testimonial hearsay statement that should not have been admitted unless the State could show that the author of the report was unavailable and defendant previously had an opportunity to cross-examine the declarant. Defendant adds that under *Crawford*, the toxicology evidence could not be properly admitted as a nontestimonial business record because it was specifically generated in anticipation of trial. Finally, defendant argues that even if this court were to find that

the toxicology evidence was admissible as a business record, the evidence should have been excluded because the Illinois statute codifying the business record exception is unconstitutional.

The State responds that *Crawford* does not bar the admission of the toxicology evidence because the evidence was not admitted for the truth of the matter asserted, was not hearsay and, therefore, does not implicate defendant's confrontation right. Further, the State maintains that even if the evidence were hearsay, it was properly admitted as a business record. Finally, the State asserts that this court need not decide the constitutionality of the business record statute because any error in admitting the toxicology evidence was harmless.

At trial, Dr. Harkey testified that he is not board certified in the field of toxicology, but he has been trained in toxicology and toxicology interpretation. He explained that he does not perform the actual toxicology tests because he does not have the equipment to do so, but he does interpret the results of the tests once they are performed. Dr. Harkey testified it was the "usual routine" of the medical examiner's office to draw blood from a decedent and send it to the American Institute of Technology (AIT), an outside laboratory. Dr. Harkey stated that the medical examiner's office had been sending blood samples to AIT for toxicological testing for more than 10 years. He explained that AIT analyzes the blood and submits a report to the medical examiner, which is then used by the examiner to form an opinion as to cause of death. Dr. Harkey stated that he did not know who conducted the toxicology testing in this case. He only knew the name of the lab and the name of the scientist who signed the report. He could not say whether the equipment used in the testing was checked for accuracy.

Dr. Harkey testified that he sent blood taken from Erin's body to AIT for testing and received a report in this case. Dr. Harkey explained that the toxicology report indicated that there was a lethal level of pseudoephedrine, a drug commonly found in over-the-counter decongestants such as Nyquil or Robitussin, in Erin's system. There was also a lethal amount of diphenhydramine, an antihistamine available in over-the-counter drugs such as Benadryl. A concentration of doxylamine, another type of antihistamine that generally causes sleepiness, was found in Erin's blood, in a dose three times more than the maximum therapeutic dosage for the drug. Dextromethorphan, a nonnarcotic cough suppressant, was likewise found in Erin's blood at a dose that was 60 times the maximum therapeutic dose. Acetaminophen, the drug found in Tylenol and many over-the-counter medicines such as Nyquil and Robitussin, was detected in Erin's system at 10 times more than the therapeutic dose. Finally, alcohol was found in Erin's system, which would be consistent with the ingestion of elixir-type medications, some of which can contain 10% alcohol. Dr. Harkey stated that in his examination of Erin, he noticed blue-green staining in Erin's digestive tract, specifically in the small and large intestines. Dr. Harkey opined that the staining resulted from food coloring contained in the medications Erin ingested prior to her death. Defendant asserted an ongoing objection to Dr. Harkey's testimony regarding the findings in the toxicology report on *Crawford* grounds. The trial court overruled the objection, stating: "He indicated he relied on these results in forming his opinion. Your objection is overruled."

We generally review a trial court's decisions concerning admission of certain testimony for an abuse of discretion. *People v. Sutherland*, 223 Ill. 2d 187, 281 (2006). However, defendant's claim that his sixth amendment confrontation rights were violated involves a question of

law, which we review *de novo*. *Rolandis G.*, 232 Ill. 2d at 23.

As previously stated, when considering a claim under *Crawford*, the threshold question is whether the out-of-court statements complained of were testimonial. *Stechly*, 225 Ill. 2d at 279; *Rolandis G.*, 232 Ill. 2d at 25. However, we need only consider that question if the statements at issue were, in fact, hearsay statements offered to prove the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9, 158 L. Ed. 2d at 197 n.9, 124 S. Ct. at 1369 n.9; *People v. Johnson*, 389 Ill. App. 3d 618, 631-32 (2009); *People v. Williams*, 385 Ill App. 3d 359, 368-69 (2008), *appeal allowed*, 231 Ill. 2d 653 (2009); *Peoples*, 377 Ill. App. 3d at 983. This court has long held that prohibitions against the admission of hearsay do not apply when an expert testifies to underlying facts and data, not admitted into evidence, for the purpose of explaining the basis of his opinion. *People v. Nieves*, 193 Ill. 2d 513, 528 (2000); *Sutherland*, 223 Ill. 2d at 281.

In *Wilson v. Clark*, 84 Ill. 2d 186, 192-94 (1981), the plaintiff asserted that the trial court erred in admitting into evidence hospital records that were used by the defendant's expert to form the basis of his medical opinion, without the testimony of the person who made the records. This court held that it was error to admit the records in *Wilson* based on the law in effect at the time, but declared that, in the future, it would be unnecessary for hospital records to be admitted when they are used for the purpose of eliciting a medical opinion. *Wilson*, 84 Ill. 2d at 192, 195-96. This court adopted Federal Rule of Evidence 703, which provided that an expert may give opinion testimony which relies upon facts and data not in evidence, as long as the underlying information is of the type reasonably relied upon by experts in the particular field. *Wilson*, 84 Ill. 2d at 192-94.

Illinois courts have since expanded the reach of the *Wilson* opinion. The appellate court has construed the holding in *Wilson* to permit experts not only to consider the reports commonly relied upon by experts in their particular field, but also to testify to the contents of the underlying records. See *Pasch*, 152 Ill. 2d at 176, citing *Henry v. Brenner*, 138 Ill. App. 3d 609 (1985); *Kinsey v. Kolber*, 103 Ill. App. 3d 933 (1982); *In re Germich*, 103 Ill. App. 3d 626 (1981); *People v. Rhoads*, 73 Ill. App. 3d 288 (1979). In *Pasch*, this court considered whether this broadening of the *Wilson* rule was proper and determined to what extent evidence resulting from nontestifying experts' examinations of underlying facts and data (specifically medical and psychological records) was admissible and in what manner it could be admitted. *Pasch*, 152 Ill. 2d at 175. This court stated:

> "Through the development of the law in this area, it now appears to be well settled that experts may consider not only medical and psychological records commonly relied upon by members of their profession in forming their opinions [citation], but they may testify as to the contents of these records as well [citations]. Case law supports the proposition that an expert can testify as to nontestifying experts' findings and conclusions. ***
>
> While the contents of reports relied upon by experts would clearly be inadmissible as hearsay if offered for the truth of the matter asserted, an expert may disclose the underlying facts and conclusions for the limited purpose of explaining the basis for his opinion. [Citation.] By allowing an expert to reveal the information for this purpose alone, it will undoubtedly aid the jury in assessing the value of his opinion." (Emphasis omitted.) *Pasch*, 152 Ill. 2d at 176.

See also *People v. Nieves*, 193 Ill. 2d 513, 528 (2000); *Sutherland*, 223 Ill. 2d at 281.

Since our decision in *Pasch*, Federal Rule of Evidence 703, upon which the *Wilson* opinion was based, has been amended. It now provides that "[f]acts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the

court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703 (amended 2000). Illinois has not adopted the amended version of Rule 703, and defendant does not ask us to consider the amended version of the rule in this case.

This court's holding in *Pasch* and the cases following it show that the toxicology evidence relied upon by Dr. Harkey was properly admitted in this case. Dr. Harkey specifically testified that it was common practice in his field to rely on toxicological reports prepared by an outside laboratory when drawing conclusions related to a postmortem examination. Illinois courts have acknowledged this type of data is generally relied upon by experts in the field of pathology. See *Nieves*, 193 Ill. 2d at 528; *People v. Sims*, 374 Ill. App. 3d 231, 252 (2007). Dr. Harkey also explained how information gleaned from the toxicology reports assisted him in determining the cause of Erin's death. Additionally, Dr. Harkey discussed his own physical findings and observations during the postmortem examination, such as the fact that Erin's large and small intestines were discolored. The information contained in the toxicology report, including raw data concerning the "concentration" of certain drugs detected in Erin's blood system, provided insight into these physical observations. Dr. Harkey specifically stated that he is trained to interpret these test results to reach his own conclusion about the cause of death in a particular case.

We conclude that Dr. Harkey's testimony regarding the toxicology testing was elicited to show the jury the steps Dr. Harkey took prior to rendering an expert opinion in this case, and was not admitted to prove the truth of the underlying assertion. The trial court did not err in admitting this evidence, as doing so comported with this court's current precedent. *Pasch*, 152 Ill. 2d at 176; *Nieves*, 193 Ill. 2d at 528; *Sutherland*, 223 Ill. 2d at

281. In light of this court's decisions in *Wilson* and its progeny, we find that *Crawford* is not implicated in this situation because the toxicology evidence was admitted for reasons other than to prove the truth of the matter asserted. *Pasch*, 152 Ill. 2d at 176; *Nieves*, 193 Ill. 2d at 528; *Sutherland*, 223 Ill. 2d at 281; see also *Johnson*, 389 Ill. App. 3d at 631-32; *Williams*, 385 Ill. App. 3d at 369-70, *appeal allowed*, 231 Ill. 2d 653 (2009).

Defendant makes no argument in his brief against admission of the toxicology evidence under the *Wilson* line of cases. Instead, defendant urges us to reach a contrary conclusion in light of the appellate court's opinion in *People v. Feazell*, 386 Ill. App. 3d 55 (2007). In that case, the appellate court concluded that under *Crawford*, defendant's confrontation rights were violated where a police officer testified to the substance of incriminating statements made by a nontestifying codefendant. The State argued that these statements were not admitted to show the truth of the matter asserted but, rather, were admitted to show the course of the criminal investigation. The appellate court rejected this argument, finding that the testimony exceeded the bounds of the police-investigation exception because the officer testified to the substance of the statements, rather than the fact that the statements were made. *Feazell*, 386 Ill. App. 3d at 66. Here, the facts and data testified to by Dr. Harkey fall within the bounds of the rule established in *Wilson*, and we have routinely held that this type of underlying data does not amount to hearsay. *Wilson*, 84 Ill. 2d at 192-94; *Sutherland*, 223 Ill. 2d at 281; *Nieves*, 193 Ill. 2d at 528; *Pasch*, 152 Ill. 2d at 176; *Anderson*, 113 Ill. 2d at 10-11; *Johnson*, 389 Ill. App. 3d at 631-32; *Williams*, 385 Ill App. 3d at 368-69, *appeal allowed*, 231 Ill. 2d 653 (2009). We see no reason to depart from that holding here.

Additionally, defendant asserts that admitting the toxicology evidence in this case was erroneous because section 115—5.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—5.1 (West 2002)), which governs the admission of coroner's records as *prima facie* evidence under a business records exception to the hearsay rule, is unconstitutional under the sixth amendment's confrontation clause. In support of his contentions concerning the constitutionality of section 115—5.1 (725 ILCS 5/115—5.1 (West 2002)), defendant asks us to consider the briefs and argument in *Melendez-Diaz v. Massachusetts,* a case which was pending in the United States Supreme Court when defendant filed his briefs in this case, and has since been decided by the Supreme Court. See *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 174 L. Ed. 2d 314, 129 S. Ct. 2527 (2009). We decline consideration of defendant's arguments in this regard because the toxicology evidence in question was not admitted as *prima facie* evidence and was not admitted as a business record. As previously explained, the evidence was admitted to show the jury the steps Dr. Harkey took to reach an opinion in this case.

*Separate Hearing for Sentence Enhancing Factor*

Defendant next asserts that his right to due process was violated because the jury was asked to decide whether the murder charged was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty at the guilt phase of trial. Defendant maintains that the trial court should have granted his motion to present this question to the jury in a separate, posttrial hearing because a separate hearing is required under section 9—1(d) of the Criminal Code of 1961 (720 ILCS 5/9—1(d) (West 2004)). The State responds that defendant forfeited review of this claim. Alternatively, the State argues that the trial court's decision to conduct a unitary hearing during the guilt phase was proper.

Defendant was charged with first degree murder and the charging instrument contained the allegation that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. During the jury instruction conference, defendant objected to instructing the jury on the exceptionally heinous and brutal factor and instead requested that the trial court conduct a separate, posttrial hearing to allow the jury to decide this issue. Counsel stated:

"I'll tell you exactly what we're worried about. *** That if the jury looks at both of these allegations, the allegation of murder and the allegation of exceptionally brutal and heinous in the same proceeding, there's naturally going to be a tendency for bargaining or discussion among what appears to be one charge and might be a higher charge. And, therefore, what we're afraid of is that the jury is going to *** look at the murder charge as a lesser included of murder plus exceptionally brutal and heinous. And there's going to be a natural tendency to compromise as to first-degree murder and not find exceptionally brutal and heinous. *** And there's also an additional problem with this, for instance, because they won't know what exceptionally brutal and heinous means in terms of a consequence, number one. And number two, the way the law is structured, he could be found innocent of exceptionally brutal and heinous behavior and given the death penalty on a different ground. *** [B]y the way, the State is not precluded from seeking eligibility if they lose exceptionally brutal or heinous."

The trial court denied defendant's motion, stating: "I don't see the danger that there's going to be some sort of a compromise if it's part of the original instructions that they get during phase one. So the request for a separate hearing will be denied." The jury was subsequently given the relevant instruction and found defendant guilty of first degree murder accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. In his posttrial motion, defendant argued that the trial court erred in denying his request for a separate hearing.

To preserve an issue for appellate review, a defendant must both object at trial and present the issue in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Coleman*, 227 Ill. 2d 426, 433 (2008). A specific objection at trial forfeits all grounds not specified. *People v. Cuadrado*, 214 Ill. 2d 79, 89 (2005); *People v. O'Neal*, 104 Ill. 2d 399, 407 (1984). An issue raised by a litigant on appeal does not have to be identical to the objection raised at trial, and we will not find that a claim has been forfeited when it is clear that the trial court had the opportunity to review the same essential claim. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008); *People v. Heider*, 231 Ill. 2d 1, 18 (2008). In this case, defendant asserted at trial that a separate hearing on the brutal or heinous conduct issue was required because jurors might be tempted to return a compromise verdict. Defendant now asserts that a separate hearing on this issue was required because section 9—1(d) of the Criminal Code requires a bifurcated hearing. The claim defendant raises on appeal is significantly different from the claim he raised below. Accordingly, we find that it is forfeited.

Defendant urges us to consider his forfeited claim under plain error. "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Defendant bears the burden of persuasion, and if he fails to meet this burden, the " 'procedural default must be honored.' " *People v. Walker*, 232 Ill. 2d 113, 124 (2009), quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995). Before considering whether the plain-error exception applies, we must first determine whether any error occurred. *Herron*, 215 Ill. 2d at 187; *People v. Johnson*, 218 Ill. 2d 125, 139 (2005).

Section 9—1(d) provides: "Where requested by the State, the court shall conduct a separate sentencing proceeding to determine the existence of factors set forth in subsection (b) and to consider any aggravating or mitigating factors as indicated in subsection (c)." 720 ILCS 5/9—1(d) (West 2004). The State requested a separate death sentencing hearing in this case, and its request was granted. Defendant argues that, pursuant to section 9—1(d), the State's request bound the trial court to conduct a separate hearing on any factor which pertained to the defendant's sentence, as the statute does not grant the trial court discretion to deny the State's request for a separate hearing. We disagree with defendant's interpretation of the statute.

Section 9—1(d) does require the trial court to conduct a separate sentencing hearing at the State's request, for purposes of determining the existence of death penalty eligibility factors and aggravation and mitigation factors explicitly set forth in subsections (b) and (c) of the statute. Subsection (b) contains 21 factors that, if proven, would permit a sentence of death. 720 ILCS 5/9—1(b) (West 2004). Proof that the murder committed was accompanied by exceptionally brutal or heinous conduct indicative of wanton cruelty is not one of the factors listed in section 9—1(b), unless the victim was under the age of 12 or over the age of 60. See 720 ILCS 5/9—1(b)(7), (b)(16) (West 2004). The victim in this case did not fall into either age category. Subsection (c) lists seven factors that can be considered in aggravation and mitigation. The heinous or brutal nature of the crime is not a factor considered under this category. The plain language of section 9—1(d) demonstrates that it does not mandate a separate sentencing hearing for a sentence-enhancing factor that is not a basis for imposition of the death penalty. Accordingly, it was not error for the trial court to reject defendant's request for such a hearing.

Because we find that no error occurred, defendant cannot meet his burden of proving plain error, and the procedural default must be honored. *Walker*, 232 Ill. 2d at 124.

### *Jury Instruction*

Defendant next asserts that the trial court erred in failing to specifically instruct the jury that the defendant was presumed innocent, not only of the murder charge against him, but also of the allegation that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The State responds that such an instruction is not required by law and was unnecessary.

The purpose of jury instructions is to provide the jury with correct legal rules that can be applied to the evidence to guide the jury toward a proper verdict. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007). In a criminal case, the trial court is required to properly instruct the jury on the elements of the offense, the burden of proof, and the presumption of innocence. *Pierce*, 226 Ill. 2d at 475. The decision to give a certain instruction rests with the trial court, and we will not reverse its judgment absent an abuse of discretion. *Mohr*, 228 Ill. 2d at 66. A trial court abuses its discretion if the jury instructions given are unclear, mislead the jury, or are not justified by the evidence and the law. *Mohr*, 228 Ill. 2d at 65-66.

Here, the jury was properly instructed on the elements of the offense of murder, the State's burden of proof, and the presumption of innocence as it applied to the charge of murder. The jury was also instructed: "If you find the defendant guilty of first degree murder, you should continue your deliberations to determine whether the State has proven beyond a reasonable doubt the fact that the offense of first degree murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." These instructions adequately advised the jury of the legal rules it needed to follow to reach a

proper verdict, particularly, that the State bore the burden of proving the brutal or heinous nature of the crime beyond a reasonable doubt. We find that the trial court did not abuse its discretion in declining to give defendant's proposed instruction.

### Additional Claim of Trial Error

Defendant's final claim of trial error involves the failure of the sheriff's department to remove defendant's prisoner identification bracelet prior to the start of jury selection. We decline to consider this claim of error, as it is not likely to arise on retrial. See *People v. Emerson,* 97 Ill. 2d 487, 502 (1983). Defendant wore the bracelet for a very short time during the *voir dire* portion of the guilt phase of trial and did not wear it during any other portion of the trial or sentencing proceedings. The parties do not dispute that the failure to remove the identification bracelet was an inadvertent oversight that was immediately corrected when called to the trial court's attention.

### Eligibility Phase Error

### Prejudice Related to Toxicology Report

Defendant revisits his argument that Dr. Harkey's testimony regarding the results of the toxicology testing was improperly admitted. Defendant asserts that admission of the toxicology evidence through Dr. Harkey was improper because it bolstered the State's claim of premeditation and created undue prejudice during the death penalty eligibility phase of the trial.[2] In support of this claim, defendant directs our attention to *People v. Cloutier,* 178 Ill. 2d 141 (1997). In *Cloutier,* we concluded

---

[2]Defendant states in his brief that the toxicology report was part of the exhibits admitted at eligibility. The record demonstrates that this exhibit was marked for identification purposes, but there is no indication that it was published to the jury.

that it was error to allow the State to present inadmissible hearsay evidence to prove a statutory aggravating factor at the eligibility phase of the defendant's capital sentencing hearing. *Cloutier*, 178 Ill. 2d at 155-56. *Cloutier* has no bearing on the instant case because, as we previously concluded, the toxicology evidence used by the State at eligibility in this case was properly admitted evidence. Accordingly, defendant's claim lacks merit.

### Sentencing Phase Errors

#### *Admission of Audiotape*

Defendant asserts that the trial court abused its discretion when it allowed the jury to hear an audiotape of a telephone message Erin left for her mother. Defendant asserts that the audiotape was irrelevant and was presented to the jury for the purpose of inflaming its passions and prejudices. The State argues that the tape was relevant victim impact evidence because it reminded the jury that Erin was a vibrant, 16-year-old girl before the murder.

It is well established that the evidentiary rules that apply at trial do not apply during the aggravation/mitigation phase of the death penalty hearing. *Mertz*, 218 Ill. 2d at 57. The only requirement regarding admissibility of evidence at this stage is that it be relevant and reliable, the determination of which lies within the sound discretion of the trial judge. *People v. Mulero*, 176 Ill. 2d 444, 472 (1997). In *People v. Howard*, 147 Ill. 2d 103, 155-58 (1991), this court adopted the view expressed by the United States Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991), permitting the State to present victim impact evidence in a capital sentencing hearing. *People v. Harris*, 182 Ill. 2d 114, 155-56 (1998). The *Payne* Court found that victim impact evidence should be admitted to remind the sentencer " 'that just as the murderer should be considered as an individual, so too the victim is an individual whose

death represents a unique loss to society and in particular to [her] family.' " *Payne*, 501 U.S. at 825, 115 L. Ed. 2d at 735, 111 S. Ct. at 2608, quoting *Booth v. Maryland*, 482 U.S. 496, 517, 96 L. Ed. 2d 440, 457, 107 S. Ct. 2529, 2540 (1987) (White, J., dissenting, joined by Rehnquist, C.J., O'Connor and Scalia, JJ.).

The audiotape defendant complains of was played during the testimony of Erin's mother, Valerie, where she described the impact Erin's death had on her own life. The tape in question lasts only seconds and is not particularly clear. However, the listener can discern that Erin is advising her mother of her whereabouts in a manner befitting a 16-year-old minor, and was relevant in the context of Valerie's victim impact testimony. We find that the trial court did not abuse its discretion in allowing the sentencing jury to hear the audiotape.

### Other Sentencing Issues

Defendant raises several claims concerning the constitutionality of the death penalty. These claims of error have been rejected in recent capital cases and we need not reconsider them here. *People v. Thompson*, 222 Ill. 2d 1, 52-53 (2006); *Mertz*, 218 Ill. 2d at 93-99; *People v. Ballard*, 206 Ill. 2d 151 (2002). Defendant also asserts that the State made an improper biblical reference in its closing argument at the sentencing phase. It is unlikely that the State will deliver the same closing argument when the matter is retried. Accordingly, we will not address this alleged error, as it is not likely to recur. *People v. Thomas*, 131 Ill. 2d 104, 115 (1989) ("we will not address *** issues on appeal, which need not arise upon retrial").

### CONCLUSION

For the reasons above, we reverse defendant's conviction and sentence and remand this cause to the circuit court for a new trial.

*Reversed and remanded.*

JUSTICE FREEMAN, specially concurring:

I agree with the majority's resolution of defendant's contention regarding his pretrial motion to suppress. 235 Ill. 2d at 126-32. I also agree that this cause must be remanded for a new trial, based upon the prejudice suffered by defendant due to the State's discovery violation during trial. 235 Ill. 2d at 111-23.

I am troubled, however, that the bulk of the majority's opinion is devoted to directing the course of defendant's trial on remand. As the majority acknowledges, the theory of the defense may change on retrial (235 Ill. 2d at 121), meaning that it is unclear at this point whether defendant will be convicted, much less be sentenced to death. Accordingly, the discussions regarding evidentiary rulings and death penalty sentencing issues as "claims of error that are likely to arise again on remand" (235 Ill. 2d at 123) seem to me both premature and inadvisable. I therefore do not join in the sections of the majority opinion which discuss the qualifications of expert witnesses (235 Ill. 2d at 124-26), the admission of other-crimes evidence (235 Ill. 2d at 132-39), the admission of toxicology evidence (235 Ill. 2d at 139-46), whether there should be a separate hearing for a sentence enhancing factor (235 Ill. 2d at 146-50), jury instructions (235 Ill. 2d at 150-51), additional claims of trial error (235 Ill. 2d at 151-52), death penalty eligibility phase error (235 Ill. 2d at 152), death penalty sentencing phase error (235 Ill. 2d at 152-53), and other sentencing issues (235 Ill. 2d at 153). I express no opinion on the issues raised in those portions of the opinion.

JUSTICE BURKE joins in this special concurrence.